## NORFOLK SOUTHERN BUS CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4531.

Circuit Court of Appeals, Fourth Circuit.

Nov. 6, 1939.

O. R. Folsom-Jones, of Washington, D. C. (S. Burnell Bragg and W. B. Rodman, both of Norfolk, Va., on the brief), for petitioner.

Berryman Green, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

PARKER, SOPER, and NORTHCOTT, Circuit Judges.

PARKER, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals which denied to the petitioner, Norfolk Southern Bus Corporation, the right to file a consolidated tax return with the Norfolk-Southern Railroad Company under section 141 of the Revenue Act of 1934.[1] It is admitted that all of the stock of petitioner is owned by the railroad company and that the principal business of that company is that of common carrier by railroad. The only question in the case is whether the principal business of petitioner is "that of a common carrier by railroad". The nature of that business was thus correctly described by the Board in its findings:

"Prior to and during 1934 the railroad company had lines running from Norfolk, Virginia, east to Virginia Beach, north to Cape Henry, and back to Norfolk, referred to as the Virginia Beach 'Loop', and generally south from Norfolk, Virginia, to Elizabeth City, Edenton, Plymouth, Washington, and New Bern, and westerly from Washington to Raleigh and Charlotte, with connecting lines to Fayetteville, Durham, Ellerbe, and Asheboro, all in North Carolina, and several other branch lines serving this general territory.

"The Virginia Beach 'Loop' of the railroad served all villages and towns between Norfolk, Virginia Beach, and Cape Henry. Prior to 1924 the principal mode of travel in the locality was on the railroad line, the roads being in poor condition. In or about 1924 the State of Virginia started building concrete roads paralleling the

---

[1] The pertinent portion of Sec. 141, which is entitled "Consolidated Returns of Railroad Corporations", is as follows:

"(d) Definition of 'affiliated group.' As used in this section an 'affiliated group' means one or more chains of corporations connected through stock ownership with a common parent corporation if—

"(1) At least 95 per centum of the stock of each of the corporations (except the common parent corporation) is owned directly by one or more of the other corporations; and

"(2) The common parent corporation owns directly at least 95 per centum of the stock of at least one of the other corporations; and

"(3) Each of the corporations is either (A) a corporation whose principal business is that of a common carrier by railroad or (B) a corporation the assets of which consist principally of stock in such corporations and which does not itself operate a business other than that of a common carrier by railroad. For the purpose of determining whether the principal business of a corporation is that of a common carrier by railroad, if a common carrier by railroad has leased its railroad properties and such properties are operated as such by another common carrier by railroad, the business of receiving rents for such railroad properties shall be considered as the business of a common carrier by railroad." 26 U.S.C.A. § 141(d) (1–3).

'Loop' railroad. The railroad, faced with a possible loss of passenger business to independently organized and operated bus companies, organized the petitioner bus company in 1926 for the purpose of transporting passengers by bus and freight by trucks over the new highways paralleling the railroad. On the Virginia Beach 'Loop' the busses supplemented the railroad passenger service and during the winter months were substituted for the railroad service. Trucks operated by petitioner provided pick-up and delivery freight service in this area. The same fares were charged and the same tickets used from Norfolk to Virginia Beach, Cape Henry, and return. Likewise the same fares were charged and the same tickets used when a person traveled from Virginia Beach to Norfolk, such fares being published with the State Corporation Commission and with the Interstate Commerce Commission and approved by them. The dispatching of both trains and busses was done by officers or employees of the railroad. Schedules were staggered and the ticket purchased entitled the purchaser to travel either by railroad or by bus. Passengers, after purchasing tickets, generally used the transportation, either bus or rail, which left first in point of time.

"In 1931 on the branch from Norfolk to Munden, Virginia, there was one round-trip passenger and one round-trip freight train a day. Bus service replaced the railroad passenger service in 1932 or 1933. Truck service was substituted for freight rail service, the freight train being run twice a week, except during the potato season in the month of June, when it was run daily.

"Service by bus and truck was instituted, generally paralleling the railroad from Norfolk south into North Carolina. Because of the fact that there was no highway across Albemarle Sound, the busses ran west from Edenton to Windsor and south from Williamston to Washington, North Carolina. They also ran from Williamston east to Plymouth along the Atlantic Coast Line Railroad and then east to Columbia, paralleling a branch line of the Norfolk-Southern Railroad Co. to Columbia and from Williamston west to Raleigh, under a contract with the Carolina Coach Co., which owned the franchise. Approximately one year after the bus service was instituted between Norfolk and New Bern, which generally parallels the railroad, the railroad company took off one of its trains which had been making the round trip daily.

"Interline tickets purchased and used on Pennsylvania Railroad lines were accepted on the busses as well as on the trains which the railroad company ran over the same route as its bus lines. The Columbia branch of the railroad from Williamston to Columbia, North Carolina, maintained a passenger service from Plymouth to Columbia which was unproductive. This was replaced by bus service, so that by 1934 petitioner operated under franchises busses and some truck lines on public highways parallel to the railroad over a large portion of the territory served by the railroad, with the exception of a comparatively short distance from Edenton west to Windsor and south from Williamston to Washington and from Williamston east to Plymouth.

"In 1934 one of the receivers of the railroad was president of the bus company. The general superintendent of the electric lines of the railroad was vice president and general manager of the bus company. The assistant secretary of the railroad was secretary of the bus company. Both companies had the same treasurer and general auditor. All the directors of the bus company were officers of the railroad. All officers of the bus company were on the railroad pay roll and their salaries were paid in the first instance by the railroad. The employees, except the bus drivers and trainmen, were the same for both the railroad and the bus company and the dispatching of both trains and busses was done by officers or employees of the railroad. The railroad in the first instance paid the administrative expenses of the bus company and, inasmuch as the administrative staff served both the railroad and the bus company, this expense was allocated to the bus company in the amount of approximatley $1,000 per month."

Upon request of petitioner for additional findings, the Board supplemented the findings quoted by the following:

"Petitioner contends that the findings do not show why it was formed, why it was set up as a separate corporation, who furnished the capital and who has actually operated the buses. Notwithstanding the fact that the Division feels sufficient findings have been made to disclose these facts, it is now specifically found as a fact that petitioner was organized and operated for the purpose of transporting passengers by bus and freight by truck;

that the legal department of the Norfolk-Southern Railroad Company advised its officers it could not own and operate such buses and trucks except through a separately incorporated company; that the railroad company furnished the original capital and it, or its receivers, own all of its capital stock; and that the petitioner, in the manner set out in the findings heretofore made, operated said buses and trucks in conjunction with said railroad company."

Petitioner contends that, although it is not a railroad carrier, its principal business is that of a carrier by railroad in that its business is an integral part of the railroad's carrier service, and that the bus and truck service maintained by it are intended to and do preserve, supplement and feed such railroad service. In other words, petitioner contends that it is a bus company engaged in the railroad business. We think, however, that what the evidence shows is not a bus company engaged in the business of a railroad company, but a railroad company through its subsidiary engaged in the business of a bus company. Whatever the purpose behind petitioner's organization and operation, the fact is inescapable that its principal business is not that of common carrier by railroad but of common carrier by bus or truck. That this business is conducted in close cooperation with the business of the railroad company does not change its essential character.

Petitioner relies upon the decision of Interstate Commerce Commission in Scott Bros., Inc., Collection and Delivery Service, I. C. C. No. MC-2744; but we find nothing in that decision which in any way supports petitioner's contention. In that case Scott Brothers, Inc., sought a permit under the Motor Carrier Act of 1935 (Part II of the Interstate Commerce Act, 49 U.S.C.A. § 301 et seq.) authorizing it to engage in local collection and delivery service for the Pennsylvania and Long Island Railroad Companies in the City of New York and vicinity. The application was denied on the ground that the service in which applicant proposed to engage was railroad common carrier service subject to Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. The Commission distinguished such service from that of the sort here involved, quoting the definition of "common carrier by motor vehicle" from the Motor Carrier Act of 1935 followed by the following quotation from the decision of the Commission in Pick-Up and Delivery in Official Territory, 218 I. C. C. 441, viz.:

"In the foregoing language there is clearly expressed an intention to exclude the motor-vehicle operations of rail carriers from the definition of a common carrier by motor vehicle to the extent that these operations are subject to the provisions of the Interstate Commerce Act. In making this exception Congress may be presumed to have legislated with knowledge of the court decisions previously mentioned, holding that pick-up and delivery service is within the meaning of 'transportation' as defined in section 1(3) of the Interstate Commerce Act, as well as with knowledge of our own administrative findings to the effect that, while railroad terminal service by motor truck was subject to regulation under the Interstate Commerce Act, the use of motor trucks by railroads in line-haul service was not subject to that act. United States v. Bailey, 9 Pet. 238, 255 [9 L.Ed. 113]; National Lead Co. v. United States, 252 U.S. 140, 147 [40 S.Ct. 237, 64 L.Ed. 496]."

The Commission also quoted with approval the following passage from American Trucking Association v. United States, D.C., 17 F.Supp. 655, 657:

"And therefore we think that in the exception Congress intended to include under the provisions of part 2 intercity motor vehicle operations of railroads but at the same time to exclude, from that part, motor vehicle operations within terminal districts."

As the principal business of petitioner was that of intercity motor vehicle operations and not local pick-up and delivery service, it is clear that it falls within Part II of the Interstate Commerce Act (the Motor Carrier Act of 1935) and not within Part I of the act covering railroad carrier service.

Petitioner contends that, in the light of its history, Section 141 of the Revenue Act of 1934, 26 U.S.C.A. § 141, should be construed to permit the filing of consolidated returns by a railroad company and a bus company occupying towards each other the relationship disclosed in this case. The language of the statute is unambiguous, however, and there is no reason for resorting to the canons of interpretation to ascertain its meaning. These, as has been often said, are to be looked to for the purpose of resolving ambiguity, not for the purpose of creating it. If, however, we

look to the history of the act, we find no intention on the part of Congress in conflict with the clear meaning of the language employed. Section 141 as originally drafted permitted the filing of consolidated returns by affiliated corporations, the report of the committee stating that, if consolidated returns were abolished, it "would be especially burdensome to many corporations such as railroads which are frequently obliged to maintain separate corporate structures in the several states in which they operate, although for all ordinary business and accounting purposes the subsidiaries form a single operating system". In the course of the passage of the bill, Section 141 as reported was stricken out and the present section was substituted for it, the debates showing that the permission to file consolidated returns was retained to the limited extent permitted by the substituted section to provide for the case of railroads having separate corporate structures but forming a single operating system. There is no indication of any intention to accord the privilege to bus companies merely because they are affiliated with railroads and operated in connection with them.

For the reasons stated, the decision of the Board will be affirmed.

Affirmed.

