WALLING, Administrator of the Wage and Hour Division, United States Department of Labor, v. BALTIMORE STEAM PACKET CO.

BALTIMORE STEAM PACKET CO. v. MAGRUDER, Collector of Internal Revenue.

Nos. 1775, 1848.

District Court, D. Maryland.

May 6, 1943.

L. Vernon Miller (of Marbury, Gosnell & Williams), of Baltimore, Md., and Robert C. Vincent (of Willkie, Owens, Otis, Farr & Gallagher), of New York City, for Baltimore Steam Packet Co.

Joseph R. Hirschmann, of Baltimore, Md., B. Harper Barnes, of Richmond, Va., and Walter T. Nolte and Edward First, both of Washington, D. C., for L. Metcalfe Walling and M. Hampton Magruder.

COLEMAN, District Judge.

These two cases, because of identity of the questions involved, were consolidated and heard together.

No. 1775 arises under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. In this case the Administrator of the Wage and Hour Division, United States Department of Labor, seeks to bring the defendant, the Baltimore Steam Packet Company, hereafter referred to as the Bay Line, under certain of his orders establishing wage rates for employees of the so-called Railroad Carrier Industry. The Bay Line resists the authority of the Administrator so to do, on the ground that it is a water carrier and cannot be classed as a railroad carrier.

The other case, No. 1848, arises under the Carriers' Taxing Act of 1937, 45 U.S.C.A. § 261 et seq. In this case the Bay Line is plaintiff and seeks to recover taxes in the amount of $20,450.45 assessed against it under this Act by the Collector of Internal Revenue for the District of Maryland, for the second and third quarters of the year 1941, which it has paid. Briefly stated, the Bay Line asserts that the assessment of these taxes is invalid for the same reason that the Bay Line in case No. 1775 resists · the Government's attempt to classify it as a railroad carrier; namely, that since, as it claims, it is not a railroad, but a water carrier, it, therefore, is not subject to the Carriers' Taxing Act of 1937.

While, as already stated, the two cases present identical questions and much duplication of testimony was avoided by the Court granting the Bay Line's petition for a consolidated hearing, nevertheless, since different statutes are involved in the two cases, separate treatment of them, in at least the earlier parts of this opinion, is considered essential in order to avoid unnecessary confusion.

First, then, as to case No. 1775. Section 206 of the Fair Labor Standards Act of 1938 provides generally for minimum hourly wages for employees within the scope of the Act. Section 205 provides for the appointment, by the Administrator under the Act, of "industry committees". Section 208 provides that any such committee "shall recommend to the Administrator the highest minimum wage rates for the industry * * * (not in excess of 40 cents an hour), [and] the Administrator * * * shall by order approve and carry into effect the recommendations contained in such report, if he finds that the recommendations are made in accordance with law, are supported by the evidence * * * otherwise he shall disapprove such recommendations."

In conformity with the aforegoing statutory authorization, the Administrator appointed "Industry Committee No. 9 for the Railroad Carrier Industry". This Committee made its recommendations to the Administrator, upon which the Administrator issued two orders. The first, dated February 14, 1941, effective March 1, 1941, established a wage rate of 36¢ per hour

"by every employer to each of his employees in the Trunk Line Division of the Railroad Carrier Industry". The second order was dated August 13, 1942, effective August 31, 1942, and established a wage rate of 40¢ per hour by every such employer. Each of these orders contain an identical definition of the term "Railroad Carrier Industry" as follows: "For the purpose of this Order the term 'Railroad Carrier Industry' means the industry carried on by any express company, sleeping car company, or carrier by railroad, subject to Part I of the Interstate Commerce Act [49 U.S.C.A. § 1 et seq.] *and* by any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, *and* which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad * * *." (Italics inserted).

The Administrator takes the position that the Bay Line is embraced within the latter part of the aforegoing definition. This, it is to be noted, has a double aspect, namely, in order to come within it a company must be one directly or indirectly owned or controlled by a carrier subject to the Interstate Commerce Act, "*and* which operates any equipment or facility or performs any service * * * in connection with the transportation of passengers or property by railroad, * * *." (Italics inserted.) In its answer, the Bay Line admits that during the effective period of the Administrator's wage orders, which form the basis of the present suit, the Bay Line paid a few of its employees wages at rates less than the minimum wages required by these orders, but it denies that it "operates any equipment or facility or performs any service * * * in connection with the transportation of passengers or property by railroad * * *." The Administrator is here making no contention that the Bay Line has failed to abide by the provisions of the Fair Labor Standards Act applicable to employers generally, or to the provisions of any orders that the Administrator may have validly promulgated thereunder for the Maritime Industry.

The particular Bay Line employees whose wages were admittedly less, at or about the time the present suit was filed, than those prescribed by the Administrator's orders, were fourteen in all, consisting of four porters, seven watchmen, one baggage man, one laundress and one stenographer. The Bay Line employs approximately 500 persons and the total number of employees receiving less than 40¢ per hour fluctuates somewhat. For example, there were only eleven on January 2, 1943. The lowest hourly wage paid to any of these persons was 30¢ to a porter and the highest was 39.5¢ to the laundress, but none of these persons are actually employed, or paid, by the hour, but on the basis of a stated monthly wage.

Turning to case No. 1848, under the Carriers' Taxing Act of 1937, Bay Line and its employees have been declared liable by the Commissioner of Internal Revenue for the years 1937 to 1942, inclusive, for taxes totalling approximately $150,000. Prior to June 29, 1940, Bay Line and its employees made returns and paid taxes under the Social Security Act (Internal Revenue Code, 26 U.S.C.A. § 1400 et seq.). On that date the Commissioner of Internal Revenue ruled that Bay Line and its employees had, since January 1, 1937, been subject to the Carriers' Taxing Act, and thereupon there was assessed against Bay Line employees the sum of $30,198.35, which represented the excess of the alleged liability of such employees under the Carriers' Taxing Act of 1937 for the periods since January 1, 1937, over and above the Social Security taxes these employees had previously paid. Bay Line was held liable for these employees' taxes since it had not withheld them from wages. Many of such employees liable for these taxes were no longer in the employment of Bay Line on June 29, 1940, and these taxes were not collectable from them. Even in those cases where the employee was still employed by Bay Line, it could not collect these taxes without hardship upon the employee. Consequently Bay Line paid them and its right to recover these taxes will be governed by the same issue involved in the present case.

In the present suit recovery is being sought only for taxes alleged to be invalidly assessed under the Carriers' Taxing Act of 1937, for the second and third quarters of 1941, since the corresponding taxes as-

sessed for the years 1937, 1938, 1939, 1940, and for the first half of 1941, were paid by Bay Line to the Collector of Internal Revenue for the District of Virginia, during those periods Bay Line's Accounting Office having been located in Portsmouth, Virginia. The Virginia Collector having refused to appear voluntarily in the present suit, an amended complaint was filed eliminating any claim against him in the present suit. However, the issue involved in Bay Line's claims being identical against both the Maryland and the Virginia Collectors, it is to be assumed that the Treasury Department will treat the ultimate determination of the present suit as also determinative of the suit against the Virginia Collector.

Section 1(a) of the Carriers' Taxing Act of 1937 provides as follows: "The term 'employer' means any carrier (as defined in subsection (i) of this section), *and* any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, *and* which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of, passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad * * *." (Italics inserted).

Subsection (i) of Section 1 of the Act, above referred to, is as follows: "The term 'carrier' means an express company, sleeping-car company, or carrier by railroad, subject to Part I of the Interstate Commerce Act."

From this point on we may proceed to consider the two cases as one and the same, because it is to be noted that the definition of a railroad carrier under which the Administrator in case No. 1775 seeks to bring the Bay Line under the provisions of his orders respecting the Railroad Carrier Industry, is identical with the definition under the Carriers' Taxing Act of 1937, pursuant to which the Collector of Internal Revenue has assessed the Bay Line for taxes under the Carriers' Taxing Act of 1937.

Let us, then, precisely examine this definition of a railroad carrier as applicable to the present case. This part of the definition embraces, as we have already explained, a two-fold status. The requirements are conjunctive, not disjunctive. The carrier may fall within either, but unless it falls within both, the definition cannot apply. First, the definition covers any express company, sleeping car company, or carrier by railroad, subject to Part I of the Interstate Commerce Act—no contention is made that the Bay Line is any one of these; and second, "any company which is directly or indirectly owned or controlled by one or more of such carriers [subject to Part I of the Interstate Commerce Act] or under common control therewith, *and* "which operates any equipment or facility or performs any service * * * in connection with the transportation of passengers or property by railroad * * *." (Italics inserted.) It will thus be seen that even though a company may be found to be directly or indirectly owned or controlled by one or more rail carriers subject to the Interstate Commerce Act, it nevertheless is still not subject to the orders of the Administrator under the Fair Labor Standards Act of 1938, relating to the Railroad Carrier Industry, or liable for taxes under the Carriers' Taxing Act of 1937, unless it is proven that it *also* operates some equipment or facility or performs some service in connection with the transportation of passengers or property by railroad.

Since the Government's position becomes untenable in both cases unless the Bay Line be proven to be within the second part of the definition as well as the first part, and since we are completely satisfied from the evidence that has been produced, that the Bay Line is not within that second part, we will proceed at once to a recital of the facts which we believe fully sustain our conclusion.

The Bay Line is the oldest steamboat company now operating in the United States. It was incorporated by a Special Act of the General Assembly of Maryland (Chapter 328), enacted March 18, 1840, and by various supplementary Acts passed subsequent thereto, but not relevant to the present issue. By this original Act, the Company was created solely "for the purpose of employing one or more steamboats to navigate the Chesapeake Bay and its tributary streams, or to navigate the Atlantic Coast, or any of the bays and rivers emptying into the Atlantic Ocean and to connect thereto boats, vessels, stages or other carriages, for the conveyance of passengers, towing of ships, vessels, rafts or

arks, and the transportation of merchandise or other articles." The following quotation from the brief of counsel for the Bay Line accurately epitomizes the Bay Line's operation: "During its long and eventful history Bay Line has continuously operated steamships in each direction between Baltimore and the various Hampton Roads, Virginia, ports. Bay Line vessels have sailed in an overnight service between these ports for over one hundred years except for occasional interruption caused by storm, fire, shipwreck or a temporary lack of sufficient ships to maintain the service, due to requisition of its ships during the Civil War. Bay Line also maintained a service for a short time between Baltimore and landings on the York River in Virginia. In addition, Bay Line has from time to time in the past operated a summer cruise service leaving Baltimore on Friday night, touching at various Chesapeake Bay ports and returning on Monday morning. It has also upon occasion made special charter cruises. These have at all times constituted Bay Line's sole activities."

The Company has up to the present time owned, chartered or operated a total of fifty-four passenger and freight ships. In 1937 the Company owned and operated between Baltimore and Norfolk three combination freight and passenger vessels, and in addition owned a small motor launch and a small motor freighter. In 1941 the latter was sold and in the same year Bay Line acquired from Chesapeake Steamship Company, which had long been a competing company, three combination freight and passenger vessels and one tugboat. However, in 1942, the Government requisitioned the four steamships and the Company now has in operation and owns only two vessels, namely, the "City of Norfolk" and the "City of Richmond", plying between Baltimore and Norfolk, and operates a number of lighters in both ports. In addition, Bay Line owns and operates terminal properties at both places, consisting of piers, warehouses and office buildings. Its headquarters are at its piers in Baltimore.

Turning now to a consideration of Bay Line's method of operations, the following facts are uncontradicted as disclosed by the testimony produced at the hearing:

Bay Line solicits passenger and freight traffic by advertising, and through the employment of individual solicitors, maintaining offices for this purpose at both its Baltimore and Norfolk terminals. It also maintains a small office at Old Point Comfort, Virginia, jointly with the Norfolk & Washington Steamboat company, the Pennsylvania Railroad Company, and the Chesapeake & Ohio Railway Company. Prior to 1941, it had a similar arrangement with the Chesapeake Steamship Company, and prior to 1936, with the Mobjack Bay Line.

In Norfolk, Bay Line maintains a city ticket office in conjunction with the Seaboard Air Line Railway Company, and until recently did the same in Baltimore, but now passenger accommodations and tickets can only be obtained in the latter place at the Company's pier office. Bay Line also has a freight agency at Portsmouth, Virginia, and formerly had a freight solicitation agency in Winston-Salem, North Carolina. Passengers embark and disembark from Bay Line vessels at its piers in Baltimore and Norfolk and at the Government pier at Old Point Comfort.

Freight is handled by the Company as follows: In Baltimore, freight is either trucked to the Bay Line piers and loaded into its vessels from the trucks or is brought alongside the vessels in Bay Line's own lighters from other piers in the harbor. There is no rail connection with any of Bay Line's piers. In case of interchange of through freight between Bay Line and a railroad or another steamship line at Baltimore, such freight is either trucked or lightered between the railroad station or piers or the steamship company's piers, and Bay Line's piers. At Norfolk, freight is received and discharged from the Bay Line pier. It both reaches and leaves the pier by lighter or truck, there being no rail connection. At both Baltimore and Norfolk the trucking service is performed by parties that are entirely independent of the Bay Line in every respect. Just as in Baltimore, Bay Line maintains its own lighters at Norfolk which are towed to and from railroad, steamship and other piers to pick up freight to be brought to Bay Line's vessels. In addition, when the volume of freight justifies, Bay Line vessels sometimes go to and from the piers of various railroads in Norfolk and Portsmouth and discharge and receive freight directly from such piers.

Pursuant to Part III of the Interstate Commerce Act, 49 U.S.C.A. § 905(b), Bay Line maintains through routes and joint

rates with all railroad lines serving Baltimore and the Hampton Roads, Virginia, ports, and publishes joint tariffs.

It is to be noted that in the interchange of freight with the railroad lines, which we have already described, Bay Line, in no case, has any interest in the trucking service, and it neither loads nor unloads the railroad cars, nor do any of the rail carriers participate in the loading or unloading of any of Bay Line's vessels. It is true that at one time, but prior to the period here involved, Bay Line, in an effort to improve its service, unloaded certain freight, chiefly copper, from cars on one of the piers of the Southern Railway in order that the same might be loaded directly into Bay Line vessels at the time they were docked. This practice was discontinued, however, because the Southern Railway found it could not afford to keep cars spotted at its pier from the time of their arrival until such time as a Bay Line vessel might dock.

There is a total absence of any testimony in the present case to the effect that the Bay Line on its own part or any carrier with whom the Bay Line has had, or now has, joint arrangements, acted not for itself, but as an agent for one or more of the participating carriers. In entering into arrangements for through traffic, Bay Line has consistently followed the practice of other steamship companies, generally, in their dealings with connecting rail and water carriers. The nature of Bay Line's business has required it to make overnight sailings, and thus the arrival and departure times of its vessels does not conform to the schedules of any railroads. Likewise, conversely, no railroad schedules have been adjusted to Bay Line's arrival or sailing time. Much the smaller part of Bay Line's revenue is from interchange business, its port to port freight and passenger traffic being by far the greater source of Bay Line's revenue. For example, in the years 1938, 1939 and 1940 the Bay Line's freight and passenger revenue from interchange traffic was less than one-third of its total revenue, and in the years 1941 and 1942 it was not very much greater.

It is believed that enough of the rather voluminous testimony introduced at the consolidated hearing has been analyzed to show that the uncontradicted facts with respect to the Bay Line's vessels and other properties, and the method of their operation in the transportation of both passengers and freight, permit of only one conclusion, namely, that the Bay Line does not now, nor has it operated during the period here in question, any equipment, or facility or performed any service in connection with the rail transportation of passengers or property, other than in its capacity of establishing and maintaining through routes and joint rates with connecting carriers. The question therefore is this: Does such constitute the kind of operation in connection with the transportation of passengers or property by railroad within the meaning of the twin provisions in the orders of the Administrator under the Fair Labor Standards Act of 1938, and in the Carriers' Taxing Act of 1937?

In the case of Allen v. Ocean S. S. Company of Savannah, 123 F.2d 469, a decision in 1941 of the Circuit Court of Appeals for the Fifth Circuit, that Court was presented with facts which are strikingly similar to those in the present case, and was asked to decide the same question here involved with respect to the Carriers' Taxing Act of 1937. No question was there involved with respect to the application of the Fair Labor Standards Act of 1938. In that case, the steamship company was engaged exclusively in operating a steamship line between Savannah, New York and Boston. The District Court, although finding that the steamship company was owned and controlled by the trustees of the property of Central of Georgia Railway Company, nevertheless found that it did not operate any equipment or facility or perform any service for transportation of passengers or property by railroad, and, hence, was not covered by the Carriers' Taxing Act of 1937. The Appellate Court affirmed the findings of fact and conclusions of law of the lower court, and gave in its opinion the following summation of the factual situation with respect to the steamship company, and its conclusions of law with respect thereto, all of which, we believe, fits the present case in a striking manner (123 F.2d 470, 471):

"In that view the fact that from the date of its incorporation in 1872, until now, the stock of appellee, subject to a collateral trust mortgage, has been owned first by the Central Railroad and Banking Company of Georgia, next by its successor, the Central of Georgia Railway Company, and is now owned by Pollard and Lovett, trustees of Central Railway, is an important one. But as important is the fact that not-

withstanding all these changes of ownership and management of the railway company, appellee has not been and is not now affected by them, but has, during all of the period, continued to be and is now, operated by its own officers and directors, and entirely, separately and independently of the railway company.

"A further important, indeed a controlling fact, is that the freight traffic, whose handling appellant relies on as bringing appellee within the act, is freight delivered on through rates controlled and prescribed by traffic to which the participating carriers are parties, these tariffs filed and published in accordance with the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. Such tariffs state the rate and the gross sum and do not show its component parts or how it is to be divided between those participating, in rendering the transportation service. The service to be rendered by each carrier in the through transportation, and the division of the through rate among them is determined by agreements or conventional arrangements which also determine the point and the manner of delivery. This being so, the details with which the record and the briefs are so much taken up, of how and by whom each particular step in the carriage is effected become wholly unimportant. For each transportation step when performed by carrier or steamship is performed for itself as its own transportation and not by it as agent and for another, as the transportation of that other. What is important is that though appellee's stock is owned by the Central Railway, appellee is in no sense and at no time its agent. In no sense and at no time does it operate any equipment or facility for the railway or perform any transportation service for it, or receive, deliver, or handle for it, property being transported by the railway. It operates its own equipment and facilities, performs transportation service for itself, and for itself handles the property delivered to it by, and which in turn it delivers to, carriers by rail. In this view, we find it wholly unimportant to consider or differentiate the numerous classifications for the purpose of taxation under the act, cited to us, which the Railroad Retirement Board has made, or the rulings and orders of the Commission and the decisions of the courts on other and different statutes, also cited. We find it important only to determine whether upon a consideration of

the language of the invoked act in the light of its relation to the Special System of Social Security for the railroad industry, and the relation of that system to the System of Social Security as a whole, they more reasonably support the view urged upon us by appellant or that urged by appellee. Appellant's view, stripped to its base, is that appellee, though engaged exclusively in operating a steamship line between Savannah, New York and Boston, is intended to be and is made subject to the Special Railroad, instead of the General, Social Security System, merely because it is owned by a railroad, participates in through routes and joint rates with its parent company and other railroads, and as a part of a through transportation, handles freight to and from the railroad carriers with which it has arrangements. Appellee's view simply stated is that a steamship company carrying by water and not by rail, is a part not of the railroad but of the maritime industry of the country, and that it is an unreasonable construction of the terms of the act, to hold that appellee is included within them."

As far as we are advised, certiorari was never sought in the Ocean Steamship Company case, and our attention has been directed to no other reported decision involving the same questions as those involved in that and the present case. We concur fully in the reasoning of the Court in that case and believe that it is equally applicable in every respect to the present case.

To decide otherwise would, we believe, be tantamount to upsetting the status of the Bay Line as a water carrier which, for many years, has been firmly established by decisions of the Interstate Commerce Commission and accepted by the Courts. See Matter of Jurisdiction over Water Carriers, 15 I.C.C. 205; Steamer Lines, Norfolk to Baltimore, New York, and Other Points, 41 I.C.C. 285; Matter of Securities of Seaboard-Bay Line Company, 71 I.C.C. 501; and Baltimore Steam Packet Company Acquisition, Control, etc., 244 I.C.C. 583. The last-named decision approved and authorized purchase by the Bay Line of the properties of the Chesapeake Steamship Company of Baltimore City, and the acquisition by the latter Company, the Atlantic Coast Line Railroad Company, the Southern Railway Company, and the receivers of the Seaboard Air Line Railway Company of control of the Bay Line through stock ownership. It also approved and author-

ized under the Panama Canal Act, 49 U.S.C.A. § 5 (14–16), continuance by the receivers of the Seaboard Air Line Railway Company, and acquisition by the Chesapeake Steamship-company, the Atlantic Coast Line Railroad and the Southern Railway of interests in the Bay Line. Nowhere in this decision is there any intimation of a departure from the status which the Interstate Commerce Commission had always maintained the Bay Line possessed, namely, that of being exclusively a water carrier. In the course of its opinion the Interstate Commerce Commission said (244 I.C.C. pages 585, 603): "The bay lines compete with each other, with other water lines serving Norfolk and other ports, and with rail carriers, motor carriers, and airplane lines. * * * We have heretofore held that the Baltimore Company (the Bay Line herein) is not a carrier by railroad within the meaning of section 20a of the act [49 U.S.C.A. § 20a]. [Matter of] Securities of Seaboard-Bay Line Company, 71 I.C.C. 501."

Indeed, this Court cannot blink the fact that throughout the course of the entire hearing of the present case there appeared to be a deplorable variance and unreasonable inconsistency between the position taken by counsel for both the Administrator under the Fair Labor Standards Act and the Commissioner of Internal Revenue under the Carriers' Taxing Act, and the position which the Interstate Commerce Commission, as far as we are aware, has always taken. The same appears to have been true in the Ocean Steamship Company case. Here, as there, different agencies, though having the same principal, i. e., the Government, appeared to be engaged in a veiled contest with each other as to which should assume jurisdiction,—a contest which should never have begun had there been proper co-ordination between the different agencies. It is idle for Government counsel in the present case to say that if their contention be upheld it will not be tantamount to a reversal of the position which Congress, the Interstate Commerce Commission and the Courts have, for years, taken. Further example of the resulting confusion, were the Government's position to be sustained, is to be found in the Bay Line's relations with the Railroad Retirement Board under the Railroad Retirement Act of 1937, 45 U.S.C.A. § 228a et seq., which contains (Sec. 228a) a definition with respect to eligible employees substantially identical with the definition with which we are here concerned in the Carriers' Taxing Act and in the Administrator's orders under the Fair Labor Standards Act. In the present case we have been told that, upon the Bay Line being notified of the ruling of the Commissioner of Internal Revenue in case No. 1848, to the effect that it and its employees were subject to the Carriers' Taxing Act, the Bay Line applied to the Railroad Retirement Board for a ruling as to whether its employees were entitled to the benefits provided under the Railroad Retirement Act, that Board having theretofore consistently held that Bay Line employees were not so entitled. However, on January 30, 1941, the General Counsel of the Railroad Retirement Board ruled that Bay Line employees were entitled to such benefits, but as a condition of their payment, the Board imposed certain requirements looking to the refunding to it of certain specified payments in the event that at some later time it should be judicially determined that Bay Line employees do not come under the Railroad Retirement Act. If it should be judicially determined that Bay Line employees are covered by the Railroad Retirement Act, they will not be eligible for benefits under the Social Security Act, although prior to the ruling of the Railroad Retirement Board's General Counsel, just referred to, Bay Line paid pensions to various superannuated employees aggregating approximately $12,000 a year. As a result of the ruling just referred to, Bay Line has ceased to pay Federal Social Security, as well as Maryland and Virginia Unemployment Insurance taxes, but has paid the Railroad Unemployment Insurance taxes as assessed against it.

Similarly, Bay Line's status under the Railroad Unemployment Insurance Act, 45 U.S.C.A. § 351 et seq., appears to turn upon the same issue involved in the present case, since that Act contains a definition of coverage substantially identical with the definitions here under consideration in the Carriers' Taxing Act and in the Administrator's Orders.

In conclusion, we believe that the following final passages of the Court's opinion in the Ocean Steamship Company case, 123 F.2d 471, peculiarly fit in every respect the status of the Bay Line in the present case, and that we cannot better express our own views:

"It is quite apparent that the construction appellant contends for will result in cutting across industrial lines and in absorbing into the special railroad insurance system, some parts of other industries because those parts happen to be owned by railroads, while that for which appellee contends, will have no such effect. That consideration alone should, we think, give us pause in construing, indeed should prevent our construing the act as appellant does, unless its language does not reasonably admit of any other result.

"Certainly the Congressional intent to include water carriers cannot be drawn from the fact, if it be a fact, which appellant makes so much of, that water carriers, in addition to performing purely steamship services, perform for a charge and for themselves, transportation service which the railroad carriers could have undertaken but left to the water carriers to perform. For, if this were the simple criterion, Congress could easily and would have said so, instead, as it did, of confining the application of the act to rail carriers and companies owned by them which performed a part of their transportation service for them. Appellant realizing this difficulty, in the way of his construction, devotes a good part of his brief to arguing that the services performed by appellee are performed not for itself but as agent for railroad carriers. But on the record this will not at all do. Not a word of it in the slightest tends to support this view. All of it leads directly to the contrary conclusion."

Since, as already explained, our decision being adverse to the Government with respect to what the facts disclose as to whether there has been met one of the two conditions precedent to holding that the Bay Line is subject to the provisions of either the Fair Labor Standards Act or the Carriers' Taxing Act, it becomes unnecessary to consider the other question, namely, whether the Bay Line is directly or indirectly owned or controlled by one or more rail carriers, or is under common control therewith. However, without greatly extending the length of this opinion which any comprehensive analysis of the rather voluminous testimony that was introduced at the hearing on this subject would require, we will say that there is little, if any, room for doubt that the Bay Line is to be treated, in legal contemplation, as still owned by the Seaboard Air Line Railway Company, in receivership, by reason of stock ownership, this status not having been destroyed by the mortgage foreclosure proceedings relating to Seaboard. See Matter of Securities of Seaboard-Bay Line Company, and Baltimore Steam Packet Company Acquisition, Control, etc., supra.

Appropriate orders will be signed in both cases in conformity with this opinion.