WALLING, Administrator of Wage and Hour Division, United States Department of Labor, v. BALTIMORE STEAM PACKET CO.

MAGRUDER, Collector of Internal Revenue, v. SAME.

Nos. 5201, 5202.

Circuit Court of Appeals, Fourth Circuit.

June 6, 1944.

Lyle M. Turner, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to the Atty. Gen., and Bernard J. Flynn, U. S. Atty., and T. Barton Harrington, Asst. U. S. Atty., both of Baltimore, Md., on the brief), for appellant Magruder.

Bessie Margolin, Asst. Sol., U. S. Department of Labor, of Washington, D. C. (Douglas B. Maggs, Sol., Archibald Cox, Associate Sol., Kenneth Meiklejohn, and Louis Weiner, Attys., U. S. Department of Labor, all of Washington, D. C., on the brief), for appellant Walling.

Louis F. Carroll, of New York City, and L. Vernon Miller, of Baltimore, Md. (Robert C. Vincent, of New York City, Marbury, Gosnell & Williams, of Baltimore, Md., and Willkie, Owen, Otis, Farr & Gallagher, of New York City, on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

These are appeals in two cases heard together in the court below and argued together on appeal. One case was instituted by the Baltimore Steam Packet Company, commonly known as the Bay Line and hereinafter referred to by that name, to recover from the Collector of Internal Revenue at Baltimore taxes assessed against it under the Carriers Taxing Act of 1937, 45 U.S.C.A. § 261 et seq., and paid by it under protest. The other was instituted by the Administrator of the Wage and Hour Division of the Department of Labor to enjoin the Bay Line from paying less wages to its employees than prescribed by a wage order issued by the Administrator. In each case the crucial question was whether the Bay Line was an employer operating any equipment or facility or performing any service "in connection with the transportation of passengers or property by railroad." The judge below in an exhaustive opinion answered this question in the negative (Walling v. Baltimore Steam Packet Co., D. C., 50 F.Supp. 639), entered judgment for the Bay Line in the tax case and dismissed the Administrator's suit for injunction. The Collector and the Administrator have appealed.

The Bay Line is the oldest steamboat company operating in the United States, having been incorporated by the General Assembly of Maryland in the year 1840. Its stock is now owned by three railway companies, the Seaboard Air Line, the Southern and the Atlantic Coast Line; but its operations are conducted just as though it were an independently owned steamship line. The transportation which it furnishes is of benefit to the railroads which own its stock in that the connection aids them in their competition for business; but it does nothing for them that it does not do for other connecting carriers and nothing that is not done by other steamboat lines for such carriers. It carries freight and passengers between Baltimore and Norfolk and other Hampton Roads ports, maintains through routes and joint rates with all railroad lines serving these ports and publishes joint tariffs with them. The facts with respect to the interchange of freight with the railroads were thus found by the court below:

"Freight is handled by the company as follows: In Baltimore, freight is either trucked to the Bay Line piers and loaded into its vessels from the trucks or is brought alongside the vessels in Bay Line's own lighters from other piers in the harbor. There is no rail connection with any of Bay Line's piers. In case of interchange of through freight between Bay Line and a railroad or another steamship line at Baltimore, such freight is either trucked or lightered between the railroad station or piers or the steamship company's piers, and Bay Line's piers. At Norfolk, freight is received and discharged from the Bay Line pier. It both reaches and leaves the pier by lighter or truck, there being no rail connection. At both Baltimore and Norfolk the trucking service is performed by parties that are entirely independent of the Bay Line in every respect. Just as in Baltimore, Bay Line maintains its own lighters at Norfolk which are towed to and from railroad, steamship and other piers to pick up freight to be brought to Bay Line's vessels. In addition, when the volume of freight justifies, Bay Line vessels sometimes go to and from the piers of various railroads in Norfolk and Portsmouth and discharge and receive freight directly from such piers.

\*　　\*　　\*　　\*　　\*

"It is to be noted that in the interchange of freight with the railroad lines, which we have already described, Bay Line, in no case, has any interest in the trucking service, and it neither loads nor unloads the railroad cars, nor do any of the rail carriers participate in the loading or unloading of any of Bay Line's vessels. It is true that at one time, but prior to the period here involved, Bay Line, in an effort to improve its service, unloaded certain freight, chiefly copper, from cars on one of the piers of the Southern Railway in order that the same might be loaded directly into Bay Line vessels at the time they were docked. This practice was discontinued, however, because the Southern Railway found it could not afford to keep cars spotted at its pier from the time of their arrival until such times as a Bay Line vessel might dock."

Other facts with respect to Bay Line's operations are fully set forth in the opinion of the court below and need not be repeated here. It is sufficient to say that they show very clearly that what we have is, not a steamship company engaging or assisting in the business of railroad transportation, but railroad companies owning a corporation which is engaged in the ordinary business of a steamship company. Cf. Norfolk Southern Bus Corp. v. Commissioner, 4 Cir., 107 F.2d 304. The situation was accurately summarized by the judge below as follows [50 F.Supp. 644]:

"There is a total absence of any testimony in the present case to the effect that the Bay Line on its own part or any carrier with whom the Bay Line has had, or now has, joint arrangements, acted not for itself, but as an agent for one or more of the participating carriers. In entering into arrangements for through traffic, Bay Line has consistently followed the practice of other steamship companies, generally, in their dealings with connecting rail and water carriers. * * *

"It is believed that enough of the rather voluminous testimony introduced at the consolidated hearing has been analyzed to show that the uncontradicted facts with respect to the Bay Line's vessels and other properties, and the method of their operation in the transportation of both passengers and freight, permit of only one conclusion, namely, that the Bay Line does not now, nor has it operated during the period here in question, any equipment, or facility or performed any service in connection with the rail transportation of passengers or property, other than in its capacity of establishing and maintaining through routes and joint rates with connecting carriers. The question therefore is this: Does such constitute the kind of operation in connection with the transportation of passengers or property by railroad within the meaning of the twin provisions in the orders of the Administrator under the Fair Labor Standards Act of 1938, and in the Carriers' Taxing Act of 1937?"

### The Tax Case

■ Congress by the enactment of the Railroad Retirement Act, 45 U.S.C.A. § 228a et seq., the Railroad Unemployment Insurance Act, 45 U.S.C.A. § 351 et seq. and the Carriers Taxing Act of 1937, 26 U.S.C.A. Int.Rev.Code, § 1532, § 45 U.S. C.A. § 261, set up a special and separate social security system for the railroad industry. The definition of employer and employee subject to each of these acts is identical in the three acts. The definition of employer contained in the Carriers Taxing Act, 26 U.S.C.A. Int.Rev.Code, § 1532, the one here pertinent, is as follows:

"As used in this subchapter—(a) Employer. The term 'employer' means any carrier (as defined in subsection (h) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad. * * *

"(h) Carrier. The term 'carrier' means an express company, sleeping-car company, or carrier by railroad, subject to Part I of the Interstate Commerce Act."

It is admitted that the Bay Line is not a carrier subject to part 1 of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., within the meaning of (h) quoted above, and it is not denied that it is owned or controlled by one or more carriers. The only question as to the applicability of the Carriers Taxing Act, therefore, is whether Bay Line "operates any equipment or facility or performs any service * * * in connection with the transportation of passengers or property by railroad." Whether regard be had to the history and purpose of the statute, or whether we look only to the language used, we think it perfectly clear that this question should be answered in the negative.

As stated above, the statute was one of three designed to set up a social security system for the railroad industry. Water carriers were not included; and there could have been no purpose to include such of them as were controlled through stock ownership by railroad companies. Whether their stock was owned by railroad companies or not, the business in which they were engaged was essentially different from the railroad business, and there would have been neither reason nor justice in subjecting one water carrier to different taxes and regulations from those applied to its competitors merely because of stock

ownership by railroads. The purpose of the provision in question was to bring under the coverage of the act companies owned and controlled by the carriers that perform for them a service which is essentially a part of railway transportation. As said by Mr. George M. Harrison, Chairman of the Railway Labor Executives Association, one of the draftsmen of the act, in a statement before the Committee of Congress on Interstate and Foreign Commerce (Hearings on H.R. 6956, 75th Cong. 1st Sess. p. 17):

"Now section 1 might be referred to as the scope of the legislation. Section 1 makes the bill applicable to those that are defined in that section as employers. Now the employers defined in section 1 are express companies, sleeping-car company, or carriers by railroad that are subject to part 1 of the Interstate Commerce Act, and in addition thereto it is proposed to include as employers any company which may be directly or indirectly owned or controlled by the express company, the sleeping-car company, or railway company, or under common control by one or more of such companies, *when those companies are engaged in the business of transporting passengers or property for the railroad, or other service that is a part of railway transportation, such as grain elevators, private car lines, refrigerator car companies,* or other individual or body, judicial or otherwise, when in the possession of the property or operating all or any part of the business of these previously identified employers which are, express companies, sleeping-car companies, or carriers by railroad." (Italics supplied.)

In explaining that bus lines owned by carriers were not brought under the provisions of the act, Mr. Harrison used language showing very clearly that it was not intended to cover such corporations as this carrier owned steamship company. In a colloquy with Senator Brown in the hearing before the Senate Committee on Interstate Commerce (Hearings on S. 2395, 75th Cong. 1st Sess. p. 12, 13) the following was said:

Senator Brown. "The Boston & Maine, in New Hampshire, has a bus company. The passengers on those busses get railroad tickets, and the busses are coordinated with the railroad Line."

Mr. Harrison. "Well they have an arrangement for supplemental service, but it is not part of the railroad operation."

Senator Brown. "They have formed a subsidiary corporation, and operate under that?"

Mr. Harrison. "Yes."

Senator Brown. "Do you think the employees of that bus line would come under the provisions of this bill?"

Mr. Harrison. "No; those employees would not. You see, when you get into the field of bus transportation, you have not only the subsidiary corporations of the railroads, but you have many privately owned bus companies. And in this instance we have proceeded with the thought that we had better not try to invade the motor-transportation field, but that we had better restrict ourselves to the railroad industry."

If, however, we ignore the history and purpose of the statute and look only to its language, we think it clear that a steamship company in the situation of the Bay Line is not covered by it. The Bay Line performs no terminal services or other transportation for railroads, all of its services being connected with its own water transportation; and in no proper meaning of language can what it does be said to be the performing of service in connection with transportation by railroad. If additional light were needed as to the meaning of the phrase, "service in connection with", as used with transportation by railroad in the statute, it is furnished by the succeeding words "or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad". Noscitur a sociis. Clearly what was intended was to cover subsidiary corporations of railroads that render services while the transportation by railroad is in progress or services that the railroads are under obligation to render for the rates that they charge. It would be giving a forced and unnatural construction to the language to hold it applicable to water transportation merely because such transportation precedes or follows transportation by rail in the course of an interstate movement. The language used was borrowed almost verbatim from the Hepburn Act of 1906, 34 Stat. 584, 49 U.S. C.A. § 1 et seq., where its purpose was to enlarge the definition of transportation so as to include all services rendered in connection with transportation by carriers and thus prevent overcharges under the pretext of performing additional services. As said by the Supreme Court in Cleveland,

etc., R. Co. v. Dettlebach, 239 U.S. 588, 594, 36 S.Ct. 177, 180, 60 L.Ed. 453:

"* * * it is evident that Congress recognized that the duty of carriers to the public included the performance of a variety of services that, according to the theory of the common law, were separable from the carrier's service as carrier, and, in order to prevent overcharges and discriminations from being made under the pretext of performing such additional services, it enacted that, so far as interstate carriers by rail were concerned, the entire body of such services should be included together under the single term 'transportation,' and subjected to the provisions of the act respecting reasonable rates and the like."

▇ The phrase "services in connection with" is used in sections 1(3), 6(7) and 15(13) of the Interstate Commerce Act, 49 U.S.C.A. §§ 1(3), 6(7), 15(13); and, as so used, it has uniformly been construed to mean service rendered while a shipment is in the custody and control of the carrier or service which the carrier is legally obligated to perform. Thus, service is not rendered "in connection with transportation" in the case of the spotting of cars on an industrial siding (United States v. Wabash R. Co., 321 U.S. 403, 64 S.Ct. 752; United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 57 S.Ct. 804, 81 L. Ed. 1186); nor in maintaining offices, advertising the railroad or soliciting traffic over it (Lehigh Valley R. Co. v. United States, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839); nor in towing car floats to point of shipment. Pennsylvania R. Co. v. M. McGirr's Sons Co., 2 Cir., 287 F. 334.

A case "on all fours" with the case at bar is the decision of the Circuit Court of Appeals of the Fifth Circuit in Allen v. Ocean S. S. Co., 5 Cir., 123 F.2d 469, 471; and we agree with the reasoning, as well as the conclusion, of the able opinion of Judge Hutcheson in that case, wherein he said:

"Appellant's view, stripped to its base, is that appellee, though engaged exclusively in operating a steamship line between Savannah, New York and Boston, is intended to be and is made subject to the Special Railroad, instead of the General, Social Security System, merely because it is owned by a railroad, participates in through routes and joint rates with its parent company and other railroads, and as a part of a through transportation, handles freight to and from the railroad carriers with which it has arrangements. Appellee's view simply stated is that a steamship company carrying by water and not by rail, is a part not of the railroad but of the maritime industry of the country, and that it is an unreasonable construction of the terms of the act, to hold that appellee is included within them.

"It is quite apparent that the construction appellant contends for will result in cutting across industrial lines and in absorbing into the special railroad insurance system, some parts of other industries because those parts happen to be owned by railroads, while that for which appellee contends, will have no such effect. That consideration alone should, we think, give us pause in construing, indeed should prevent our construing the act as appellant does, unless its language does not reasonably admit of any other result.

"Certainly the Congressional intent to include water carriers cannot be drawn from the fact, if it be a fact, which appellant makes so much of, that water carriers, in addition to performing purely steamship services, perform for a charge and for themselves, transportation service which the railroad carriers could have undertaken but left to the water carriers to perform. For, if this were the simple criterion, Congress could easily and would have said so, instead, as it did, of confining the application of the act to rail carriers and companies owned by them which performed a part of their transportation service for them. Appellant realizing this difficulty, in the way of his construction, devotes a good part of his brief to arguing that the services performed by appellee are performed not for itself but as agent for railroad carriers. But on the record this will not at all do. Not a word of it in the slightest tends to support this view. All of it leads directly to the contrary conclusion."

To the same effect, except that it relates to a carrier owned bus line instead of a steamship line, is the decision in Interstate Transit Lines v. United States, D. C., 56 F.Supp. 332.

▇ The Collector relies upon what he says is the administrative construction placed upon the act; but administrative construction can be used as a guide to in-

terpretation only when there is ambiguity in the language of the statute and the administrative construction is consistent and not plainly erroneous. There is no ambiguity in the statute here, and we fail to find evidence of any such settled and consistent administrative construction as would justify an interpretation at variance with what we think is its clear meaning, if such interpretation were ever permissible. It is well settled that, in case of ambiguity, great weight is given to an administrative interpretation of a statute long and consistently followed; but it is equally well settled that where the provisions of an act are plain and unambiguous, the department administering it has no power to extend or amend it by regulations or interpretation. Koshland v. Helvering, 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268, 105 A.L.R. 756; Manhattan General Equipment Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528; Miller v. United States, 294 U.S. 435, 55 S.Ct. 440, 79 L.Ed. 977; Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796; United States v. Missouri Pac. R. Co., 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322; United States v. Powell, 4 Cir., 95 F.2d 752. We are impressed here with the absence of any such consistent administrative interpretation as we would be justified in following, even if there were ambiguity. As said by Judge Hutcheson in the case of Allen v. Ocean S. S. Co. of Savannah, supra:

"When the act was first adopted and appellee's general counsel inquired of the Social Security Board, the Railroad Retirement Board and the Commissioner of Internal Revenue, whether in their opinion, the company fell under Title 8 of the Social Security Act, 42 U.S.C.A. § 1001 et seq., or under the Carriers Taxing Act, the company was advised by the Chairman of the Railroad Retirement Board, that it was not an employer under the Carriers Taxing Act. A year later the Commissioner of Internal Revenue gave it, as his opinion, that plaintiff was under the act. Nearly a year later still, the general counsel of the Railroad Retirement Board, in a lengthy opinion, took the Commissioner's view, while in an opinion equally lengthy, filed a little later, the general counsel of the Social Security Board disagreed with the Commissioner. It is thus quite apparent, with different agencies of the government in a contest with each other over which shall take jurisdiction over and administer upon a citizen, under a statute designed to advise him at once of his duties and his rights, that it is only in a Pickwickian sense that appellant declares that the terms of the invoked act quite plainly bring appellee under it. More it is a strong argument for giving the statute a broad common-sense construction rather than a narrow one, sounding in mere logomachy."

The argument that the administrative interpretation relied upon by the Collector has received legislative sanction is so utterly lacking in merit as not to warrant discussion. Not only does an amendment excluding carrier owned coal companies have no reasonable tendency to show intent to include carrier owned steamship companies, but it is well settled that the rule relied on, that reenactment of a statute impliedly adopts administrative construction, applies only where the construction is not plainly erroneous. United States v. Missouri Pac. R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322. Furthermore, the act relied on as legislative sanction which applies only to coal mining companies, 54 Stat. 785, 45 U.S.C.A. § 151 note expressly provides: "Sec. 6. Nothing contained in this Act, nor the action of Congress in adopting it, shall be taken or considered as affecting the question of what carriers, companies, or individuals, other than those in this Act specifically provided for, are included in or excluded from the provisions of the various laws to which this Act is an amendment."

### The Wage Case

The question as to whether Bay Line is subject to the wage order of the Administrator of the Wage and Hour Division depends upon whether it is in the Railroad Carrier Industry as defined in the order of August 31, 1942, which, as will be seen, adopts the exact language of the definition contained in the Carriers Taxing Act with which we have been dealing. The pertinent portion of that order is as follows:

"For the purpose of this order the term 'Railroad Carrier Industry' means the industry carried on by any express company, sleeping car company or carrier by railroad, subject to part 1 of the Interstate Commerce Act, and by any company which is directly or indirectly owned or controlled

136

by one or more such carriers or under common control therewith, and which, operates any equipment or facility or performs any service (except trucking service, casual service and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad, * * * ".

It is admitted that this language of the Railroad Retirement Statutes was used in the Administrator's order with the intention of utilizing, in so far as practicable, the interpretations and decisions of the Railroad Retirement Board with respect to the coverage of the Railroad Carrier Industry; and it follows, we think, that, where the statute is interpreted not to apply to Bay Line, the language of the order must be given like interpretation. The Administrator says that the administrative order, following the language of an earlier order, was adopted after the Retirement Board had ruled that water carriers such as Bay Line were subject to the Railroad Retirement statutes and after that Board had decided to adhere to its ruling notwithstanding the decision of the Fifth Circuit in the Ocean Steamship case, supra, to the contrary; and from this the Administrator argues that the intent in the adoption of the order was to follow the interpretation which the Board was placing upon the statute. We do not see how any such conclusion can be drawn; for, if the Administrator knew of the Fifth Circuit decision and intended nevertheless that water carriers such as Bay Line or Ocean Steamship should be included in the order, the natural thing would have been to draw the order in such language as to include them. It is unnecessary, however, to waste time on such speculations. The plain answer to the position of the Administrator is that the language of the order, like the language of the statute, is free of ambiguity, and neither has application to Bay Line. The purpose in the drafting of the order was that its coverage should be co-terminous with the coverage of the Railroad Retirement statutes; and the interpretation which we have given it makes it co-terminous.

For the reason stated, the decisions appealed from will be affirmed in both cases.

Affirmed.