**DUQUESNE WAREHOUSE CO. v. RAILROAD RETIREMENT BOARD (BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES et al., Interveners).**

No. 138.

Circuit Court of Appeals, Second Circuit.

March 12, 1945.

Writ of Certiorari Granted June 11, 1945.

See 65 S.Ct. 1558.

Joseph H. Freehill, of Chicago, Ill., and Myles F. Gibbons, Gen. Counsel, Railroad Retirement Board, of Washington, D. C., David B. Schreiber, Asst. Gen. Counsel, of Chicago, Ill. (Jacob Abramson and Louis Turner, both of Chicago, Ill., of counsel), for appellant.

Burlingham, Veeder, Clark & Hupper, of New York City (George R. Allen, of Philadelphia, Pa., and Ray Rood Allen and Herbert Mayhew Lord, both of New York City, of counsel), for appellee.

Mulholland, Robie & McEwen, of Toledo, Ohio (Willard H. McEwen, of Toledo, Ohio, and Samuel J. Cohen, of New York City, and Frank L. Mulholland and Clarence M. Mulholland, both of Toledo, Ohio, of counsel), for intervening appellants.

Before CHASE, HUTCHESON, and FRANK, Circuit Judges.

HUTCHESON, Circuit Judge.

Brought under Section 11 [1] of the Railroad Retirement Act of 1937,[2] the suit was to set aside an order of the Railroad Retirement Board [3] that plaintiff within the definition [4] of the Act was an employer.

---

[1] 45 U.S.C.A. § 228k. "Court jurisdiction. An employee or other person aggrieved may apply to the district court of any district wherein the Board may have established an office or to the District Court of the United States for the District of Columbia to compel the Board (1) to set aside an action or decision of the Board claimed to be in violation of a legal right of the applicant or (2) to take action or to make a decision necessary for the enforcement of a legal right of the applicant. Such court shall have jurisdiction to entertain such application and to grant appropriate relief. The decision of the Board with respect to an annuity, pension, or death benefit shall not be subject to review by any court unless suit is commenced within one year after the decision shall have been entered upon the records of the Board and communicated to the person claiming the annuity, pension, or death benefit."

[2] 45 U.S.C.A. § 228a et seq.

[3] 45 U.S.C.A. § 228j.

[4] 45 U.S.C.A. § 228a Definitions: "For the purposes of sections 228a–228r of this title—(a) The term 'employer' means any carrier (as defined in subsection (m) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by

The claim was that the undisputed facts [5] establish as matter of law that plaintiff is not an employer as that term is defined by statute and that the Board's decision and order, that it is, is not in accordance with law. On the Board's motion for summary judgment made on the complaint, the answer and the record made before it, there

railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad, * * *".

[5] So far as material, these are the facts:

(1) Though most of its principal officers are also officers of Pennsylvania, and its stock is, and has been, entirely owned by Pennsylvania, Duquesne is in no sense a department of Pennsylvania, but it is, and always has been, conducted as a separate corporate entity, and entirely separate from and independent of Pennsylvania.

(2) A public warehouse chartered to conduct a general storage and warehouse business, services which Penn. is not obligated to, and does not perform, it is engaged solely in the commercial warehouse business at Pittsburgh and East Liberty, Pa., and though a large part of its business consists in the warehousing, the loading, unloading, and other handling incident thereto, of goods which have been, or are to be, transported over the Pennsylvania lines, it is not a carrier, nor is it engaged at all in railroading. (3) Its business is conducted under the direction of its superintendent who has full and unrestricted authority to conduct a commercial warehouse business under its charter, and its facilities are available to, and are employed by, the public generally without restrictions to goods shipped over Penn. lines. (4) Its employees are employed by it, carried on its payroll, paid solely out of its funds, and discharged by it alone. Penn. has no authority over them and nothing whatever to do with them. They are not, they have not regarded themselves, and have never been regarded by the railroad company as, its employees. They are Duquesne's employees only. (5) The two warehouses operated by Duquesne at East Liberty and Pittsburgh, are owned by Penn., being operated by Duquesne under lease from Penn. A portion of the ground floor of each warehouse is retained by Penn. and used and officially designated by it as its "freight agency." Duquesne's warehouses, as well as Pennsylvania's "freight agencies," are served by Pennsylvania's railroad tracks and are equipped with platforms or sidings and other facilities for the receipt, delivery, and other handling of inbound and outbound freight.

(6) At the East Liberty warehouse, Duquesne handles and stores only one commodity, carload sugar, which comes in and goes out over Pennsylvania's rails. The sugar is handled by Duquesne under storage-in-transit privileges permitted and covered by railroad tariffs filed by Pennsylvania with the Interstate Commerce Commission. Part of the sugar which passes through Duquesne's warehouse is refined in California and part in New York. That refined in California is moved by ship to one of the eastern ports, such as Philadelphia or Baltimore, and thence by rail to Pittsburgh; and that refined in New York is shipped by rail directly from New York to Pittsburgh. At Duquesne's warehouse, which is used as a distribution center, the packages of sugar are assembled in the proper numbers and sizes and then shipped out over Pennsylvania's lines for distribution. Incoming shipments are consigned to the owner care of Duquesne, the route being designated as "Penn R R—For Stge in Transit"; and outgoing shipments are consigned to the owner, the bill of lading having a transit record number and being marked "accorded transit privilege at East Liberty, Pa." Both the unloading of the sugar from, and its reloading into, Pennsylvania cars are performed by Duquesne at the latter's siding for the account of the shipper in accordance with the governing rail tariff (Consolidated Freight Classification No. 13) requiring owners to load and unload freight carried at carloading rates. In the case of incoming sugar, delivery is made by Penn. and receipt is taken by Duquesne when Penn. places the cars on Duquesne's siding, and Duquesne then unloads. In the case of outgoing shipments, the empty cars are placed by Pennsylvania on Duquesne's siding and loaded by Duquesne, which then receives Pennsylvania's bill of lading. The handling and storage charges are billed by Duquesne directly against the owners of the property and are paid by such owners.

(7) At its Pittsburgh warehouse, Duquesne is primarily, principally and predominantly engaged in the handling of freight which has come in, or is destined for movement, over Pennsylvania's rails, or which has both come in and is going out over Pennsylvania's rails. Approximately 95 percent of the commodities handled at that place, which commodities are diverse in character and are

was a judgment for plaintiff ordering the action and decision of the board set aside and annulled. The Board has appealed.

While we agree with the Board that the case presents no genuine issue as to any material fact, we cannot agree that these facts demanded a judgment in its favor. Indeed, we think it plain that they demanded a judgment for plaintiff. The facts on which Board and Court based their exactly opposite conclusions of law were furnished entirely by plaintiff in response (a) to the Board's questionnaire which formed the basis of the opinion originally issued by the Board's general counsel, and later adhered to by two members of the Board, that plaintiff is an employer; (b) plaintiff's additional memorandum filed with the Board September 15, 1939, and (c) its statement of facts filed February 14, 1940. These, without contradiction or inconsistency of any kind, establish that Duquesne is not a carrier but a commercial warehouseman, that it does not perform any transportation service of any kind, that the services it performs are not services which Pennsylvania, as a carrier, is obligated or has contracted to perform, and that, though Pennsylvania owns all of its stock, it is operated not as a department of Penn., but as a distinct corporate entity entirely and completely independent of Pennsylvania. It is conceded that but for the fact that Penn. owns its stock, there would not, there could not, be any claim made that the service Duquesne performs brings it within the statutory definition of "employer." The dispute between it and the Board turns on whether it operates its two warehouses "in connection with the transportation of * * * property by railroad or in receiving, delivery, storage, or handling of property transported by railroad." It is not disputed that, though it does a general commercial warehouse business, without restriction to goods which have moved or will move on the Pennsylvania lines, the major part of the goods handled by Duquesne have been, or are to be, transported on those lines, and that its operations are convenient and beneficial to the railroad and its patrons. Neither is it disputed that what Duquesne does is in discharge of its own obligations

hauled in both carload and less-than-carload form, come in by rail, the remainder coming in by truck. The respective rail and truck percentages of the outgoing commodities are 60 and 40. The services performed by Duquesne at the Pittsburgh warehouse are similar to those at East Liberty insofar as carload freight is concerned, except that no sugar is handled. As to the less-than-carload freight, Duquesne, in addition to storing it, performs the handling involved in delivering it to and receiving it from Pennsylvania's platform. The loading and unloading of less-than-carload freight is performed by Penn. at its platform. In the case of incoming less-than-carload shipments, the freight is unloaded by Penn. from the cars to its platform and is delivered to and received by Duquesne on such platform. In the case of outgoing less-than-carload shipments, Duquesne delivers the freight unto Pennsylvania's platform; Penn. then issues its bill of lading, loads the freight into the cars, and moves them out. Of the total space used by Duquesne at its warehouses at East Liberty and Pittsburgh, approximately 30 percent was devoted to the handling of freight accorded storage-in-transit privileges in 1936; approximately 12.5 percent in 1937; and approximately 12.5 percent in 1938.

(8) Duquesne handles, reconditions and sells for Penn. over freight, damaged re-fused freight, and damaged unclaimed freight under a contract entered into between the two companies on Feb. 1, 1922. Pursuant to this contract Penn. transports to Pittsburgh any freight it desires to be disposed of by Duquesne and Duquesne removes such freight to its warehouse after the payment to Penn. of all freight and other charges that may have accrued thereon. Out of the gross proceeds realized by it from each sale, Duquesne deducts a commission of ten percent and any amounts paid by it for reconditioning, drayage, freight and other charges and turns the balance over to Pennsylvania. If the owner of any unclaimed freight is ascertained prior to the sale of such freight, Duquesne delivers such freight, upon instructions from Pennsylvania, to the owner and receives from the owner such charges as Duquesne has paid to Pennsylvania. In the event that the gross proceeds of the sale of freight do not equal the expenses incurred by Duquesne, plus the ten percent commission, Duquesne is credited with the difference. If any lot of freight becomes so worthless as to be unsaleable, Duquesne disposes of it in such manner as Penn. directs. When any freight is returned by Duquesne to Penn. upon the latter's order, Duquesne is reimbursed only for the actual expenses incurred by it.

and not at all of any obligation imposed upon or assumed by the carrier. It thus appears that the point of difference between Duquesne and the Board is that the Board insists that though Duquesne, the warehouseman, operates entirely independently and not as a department of Penn., the statute is satisfied by proof, that its operations are availed of by Penn.'s customers, that they are concerned largely with goods which have been, or will be, transported, and that it is an advantage to Penn. to have a warehouse conveniently located with reference to its lines, while Duquesne insists that the statute is satisfied only when the storage, etc., is done by or for the carrier in discharge of the carrier's obligations. Coming more pointedly to it, Duquesne insists that the words of the statute, "in connection with the transportation of property by railroad or the receipt, delivery, etc. of property transported by railroad" require that the acts, which the statute sets out as definitive, be done by, or for, the carrier in discharge of the carrier's obligations imposed upon it, by law or by contract, in connection with its transportation of the property, that is, while the carrier's obligations are in course of being performed, while the Board reads the statute as though it covered acts done by or for the owner of the property before the carrier's obligation has attached or after it has been satisfied. If the Board is right, then mere ownership by a carrier of the controlling stock interest in a warehouse company which stores freight which has been or is to be transported by rail will convert that company into a carrier employer with the result that of two warehouse companies operating side by side performing the same service, storing freight which has been or is to be transported by rail, for the same customers, one will be an "employer," the other will not, according to whether its stock is, or is not, owned by a railroad company. We think it quite plain that the words of the statute considered in themselves and especially in the light both of its purpose and of the legislative history made in the course of its enactment, completely negative this view. They make it plain that the critical words "in connection with the transportation of property and of property transported by railroad" are used to denote transit and cover acts done only by or for the carrier while its obligations persist. We, therefore, agree with Duquesne that the judgment was right and that it should be affirmed. The same definition appears in the Carrier's Taxing Act [6] and in the Railroad Unemployment Insurance Act.[7] The Railway Labor Act,[8] as amended, carries substantially the same definition. Yet no one has claimed that Duquesne is subject to its terms.

■ Further, in litigation over the meaning of the definition when used in the Carriers' Taxing Act, the courts have uniformly repudiated the construction now placed by the Board in favor of the one we take.[9] But, says the Board in effect, the question is not what the courts think the act under construction here means, it is what the Board thinks it means, and the Board has spoken. Thus by virtue of being constituted the Board to administer the act, the Board has been endowed with a prescience, invested with a prepotence, in respect of statutory construction to which the courts must bow, though the facts are undisputed and the question is entirely one of law. Thus by the simple expedient of having a lawyer, under the dignified name of General Counsel for the Board issue an opinion and then adhering by a bare majority to that opinion, the Board is enabled to read the statute as it will. When the same general course was pursued by the administrator, and the same heresy was advanced in Fleming v. Belo,[10] the Courts had no difficulty in rejecting the claim. We find no difficulty in rejecting it here. None of the authorities [11] the Board cites

[6] 50 Statutes, 435, 45 U.S.C.A. § 261 et seq.

[7] 52 Statutes, 1094, 45 U.S.C.A. § 351 et seq.

[8] 48 Statutes, 1185, 45 U.S.C.A. § 151 et seq.

[9] Ocean Steamship Co. of Savanah v. Allen, 5 Cir., 123 F.2d 469; Magruder v. Baltimore Steam Packet Co., 4 Cir., 144 F.2d 130.

[10] 5 Cir., 121 F.2d 213; Affirmed 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716.

[11] National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 130-131, 64 S.Ct. 851, 88 L.Ed. 1170; Endicott Johnson Corporation v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424; Swift & Co. v. United States, 316 U.S. 216, 62 S.Ct. 948, 86 L.Ed. 1391; Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; South Chicago Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732; Rochester Telephone Corporation v. United States, 307 U.S. 125, 59 S.Ct. 754, 83

sustain its position. National Labor Relations Board v. Hearst Publications one of the cited cases, 322 U.S. 111 at page 130, 64 S.Ct. 860, 88 L.Ed. 1170, correctly states the rule:

"Undoubtedly questions of statutory· interpretation, especially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the judgment of those whose special duty it is to administer the questioned statute. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796; United States v. American Trucking Ass'n., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; [Niagara Falls Power Co. v. Federal Power Commission, 2 Cir., 137 F.2d 787]."

▆▆▆ In Fleming v. Belo, the Fifth Circuit Court of Appeals pointed out the great fallacy in the doctrine pressed in that case and generally by administrative absolutists that recent administrative construction of a statute, consisting of the legal opinion of the administration's general counsel, is entitled to great weight. This court, in Niagara Falls Power Co. v. Federal Power Commission, 137 F.2d at page 792, spoke to the same effect:

"The conventional reason for the deference exacted from courts for such rulings has always been the advantage possessed by such tribunals in the background of specialized experience and understanding, gathered from a long acquaintance of the members with the subject matter, either while they are in office or before. The continuity of this experience is assumed to build up an acquaintance inaccessible to others—courts included. If so, a single ruling, made shortly after the tribunal has been set up, should have far less weight than a series of repeated rulings over a course of years."

The very structure of our institutions, the very sources from which they derive the judicial section of the Constitution itself all concur to make it crystal clear why Congress has never given, why it could not constitutionally give to the construction of a statute by the General Counsel of an administrative body or by the body itself, controlling weight, and that the "appropriate weight" which the courts give to such construction is that which is not inconsistent with settled Constitutional doctrine. The heresy eagerly advanced by some devotees of the administrative, as opposed to the judicial, process,[12] and sometimes tolerated, sometimes toyed with judicially, that giving "due weight" means the surrender of the judicial office of interpreter of statutes, has never had official sanction.[13] Perhaps it has never been better negated, the true rule better stated, than by this court:

"In spite of the plentitude of discussion in recent years as to how far courts must defer to the rulings of an administrative tribunal, it is doubtful whether in the end one can say more than that there comes a point at which the courts must form their own conclusions. Before doing so they will, of course,—like the administrative tribunals themselves—look for light from every quarter, and after all crannies have been searched, will yield to the administrative interpretation in all doubtful cases; but they can never abdicate. Even Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301,—a case which perhaps went as far as any other,—left no doubt as to this. Mitchell v. United States, 313 U.S. 80, 97, 61 S.Ct. 873, 85 L.Ed. 1201." Niagara Falls Power Co. v. Federal Power Commission, 2 Cir., 137 F.2d 787 at page 792.

And this is bound to be so for the very foundation stone of our liberties is the fact that judges without interest in the result are to determine and apply the law, as old Hooker put it, "with all indifferency."[14]

---

L.Ed. 1147; Ellers v. Railroad Retirement Board, 2 Cir., 1943, 132 F.2d 636; South v. Railroad Retirement Board, 5 Cir., 1942, 131 F.2d 748, certiorari denied 317 U.S. 701, 63 S.Ct. 525, 87 L.Ed. 561.

[12] Judging as Administration, Administration as Judging, Texas Law Review, November, 1942.

[13] Said Justice Brandeis, concurring in St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 84, 56 S.Ct. 720, 740, 80 L.Ed. 1033. "The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied;" Cf. National Labor Relations Board v. Hearst Publications, supra; Niagara Falls Power Co. v. Federal Power Commission, supra.

[14] "We cannot be ignorant how much our obedience unto law dependeth upon this point. And so it is that 'notwithstanding even they which brook it worst that men should tell them of their duties, when they are told the same by law, think well and reasonably of it.' For why? They presume that the law doth

When then a person, claiming to be a third person, that is, neither a carrier nor an employee, aggrieved by a decision of a majority of the Board, applies to the courts to have that decision set aside, "as in violation of a legal right," the contention that the Board, constituted as this one was, with two of its three members appointed on a partisan basis,[15] is endowed with any peculiar prescience in divining the meaning of a term so precisely defined by statute, must be supported by something more than the mere claim. A search of the statute and particularly of 228k, the section relating to court jurisdiction, reveals nothing in support. More it discloses that the statute does not prescribe finality for even the Board's conclusions of fact, and that for such finality as they have, the Board must rely entirely on the principle supporting administrative fact findings.[16] When we turn from the statute to the courts, we find no case which at all supports the claim made here that where a statute has defined a term, courts must, though they do not agree with it, follow the administrator's opinion as to its meaning. The opinion in National Labor Relations Board v. Hearst Publications the case mainly relied on here, makes clear the difference between that case and this. Pointing out that Congress, without defining it, had used a broad term "employees" broadly, leaving to the Labor Board to determine its application in particular situations, the Court said,

"But where the question is one of specific application *of a broad statutory term* in a proceeding in which the agency administering the statute must determine it

initially, the reviewing court's function is limited."

Citing decisions of similar purport, it then concludes: "The Board's determination * * * is to be accepted if it has 'warrant in the record' and a reasonable basis in law."

Here Congress did not use the term "employer" broadly. On the contrary, it gave it a precise, a definite meaning. In this situation, the preceding sentence in the Hearst opinion, "Undoubtedly questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the judgment of those whose special duty is to administer the questioned statute," furnishes the guiding rule. The application of that rule requires an affirmance of the judgment. It is accordingly affirmed.

FRANK, Circuit Judge (dissenting).

Judge Hutcheson charges the Board with advocating "heresy." Perhaps because of Judge Hutcheson's eager interest in heresy-hunting, his opinion here blurs the issues by inaccurately (but doubtless inadvertently) stating the Board's position before condemning it. In order to make clear my reasons for dissenting, I shall try to state the issues more precisely.

1. The first section of the Railroad Retirement Act,[1] defines "employer" to mean (a) any carrier of a designated character[2] or (b) any non-carrier company if the non-carrier (1) is "owned or controlled by" such a carrier, and also (2) "operates any

---

speak with all indifferency, that the law is, as it were, an oracle proceeding from wisdom and understanding."

Buchanan, in 1579, said: "The maker of the law is the people, acting through a council of representatives, chosen from all classes, and the interpreter of the law should be not the king, but a body of independent judges."

While Locke declared that law is a definite, certain, known or knowable rule of action, in existence before, not after, the event, justly and impartially applied by known and indifferent judges, with authority to determine all differences according to established law.

[15] "* * * One member shall be appointed from recommendations made by representatives of the employees and one member shall be appointed from recommendations made by representatives of

carriers, in both cases as the President shall direct, so as to provide representation on the Board satisfactory to the largest number, respectively, of employees and carriers concerned. One member, who shall be the chairman of the Board, shall be appointed initially for a term of two years without recommendation by either carriers or employees and shall not be in the employment of or be pecuniarily or otherwise interested in any employer or organization of employees. * * *" 45 U.S.C.A. § 228j.

[16] South v. Railroad Retirement Board, 5 Cir., 131 F.2d 748.

[1] 45 U.S.C.A. § 228a.

[2] A carrier is defined in the Act as an express company, sleeping-car company or carrier by railroad subject to Chapter 1 of Title 49.

equipment or facility or *performs any service* (except trucking service, casual service, and the casual operation of equipment or facilities) *in connection with the transportation* of passengers or *property by railroad,* or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad." [3]

The Board, after a hearing (conceded by appellee warehouse company to have been fairly and properly conducted) decided, on the basis of the undisputed facts in the record before it, that appellee had the two specified statutory attributes of such a non-carrier employer, i.e., (1) its stock was wholly owned by railroad carrier and (2) it performed services "in connection with the transportation * * * of property by railroad."

2. No one disputes the fact that, since appellee's incorporation in 1906, all its stock has been "owned and controlled" by the Pennsylvania Railroad and that most of appellee's principal officers have been officers of the Pennsylvania. The only dispute is as to whether, on the admitted facts, appellee's activities are such that the Board could properly decide that appellee renders services "in connection with the transportation of property by [the Pennsylvania] railroad." The pertinent facts bearing on that issue are, briefly, as follows:

The Board, in its opinion, cited and quoted from Baltimore & O. R. Co. v. United States, 305 U.S. 507, 516, 517, 59 S.Ct. 284, 83 L.Ed. 318, as showing that it is well known that the average large railroad owns or controls a subsidiary or affiliated warehouse company with warehouses adjacent to the railroad's tracks, not as a mere investment, but to increase traffic over the railroad's lines by inducing shippers to use the road's "particular rail facilities." [4] Initially, this policy involved the supplying of warehouse services by the railroads at figures below cost, a practice which the Interstate Commerce Commission subsequently prohibited. But the convenience to shippers of what the Supreme Court called "accessorial services of the carriers, accurately designated commercial warehousing," [4a] and the resultant advantages to the several railroads in attracting rail shipments to their respective lines, have led to the continued rendering of such warehouse services by railroad-owned warehouse companies. The facts here make it clear that the Pennsylvania organized appellee, and that appellee's activities are now conducted, as a part of just such a railroad policy, i.e., to aid the Pennsylvania in seeking to increase the transportation of goods over its railroad system. [5]

The major part of appellee's business consists of the warehousing, loading and unloading (and other conduct incident thereto) of goods which have been, or are to be, transported over the lines of the Pennsylvania. The warehouses which appellee operates were constructed and are owned by the Pennsylvania. Those Pennsylvania-owned warehouses, located in the same buildings with the Pennsylvania's freight agencies, are highly convenient for use as distribution points by shippers who transport their goods over the Pennsylvania's railroad lines. In actual practice, nearly all the property handled by appellee is transported inbound or outbound, or both, over the Pennsylvania's rails. Appellee stores a large part of such property while it is in the course of suspended through-interstate-shipment under storage-in-transit privileges published in the Pennsylvania's tariffs. Appellee also handles, reconditions and sells for the Pennsylvania, damaged refused freight and unclaimed freight. Thereby Pennsylvania is able to collect freight and other charges on unharmed freight and to recoup losses on goods damaged in transit.

---

3 Emphasis added.

The statute also defines "employer" to include certain other persons, but those provisions have no pertinence here.

4 Cf. Propriety of Operating Practices —New York Warehousing, 198 I. C. C. 134; 216 I. C. C. 291.

4a Baltimore & O. R. Co. v. United States, 305 U.S. 507, at 516, 59 S.Ct. 284, 83 L.Ed. 318.

5 In its opinion the Board said: "It may be noted that warehousing activities like those of Duquesne are conducted by numerous railroads throughout the United States, either directly or through subsidiaries, as an incident to their railroad transportation service, because by providing such services, railroads are able to induce shippers to use their rail facilities and thereby increase the volume of traffic over their respective lines. * * * And it has been recognized that such warehousing facilities are conducted for the same purpose and achieve the same results, whether they are conducted directly by the railroads or by subsidiaries of the railroads."

On the basis of these facts (which I have stated in summary manner), the Board found that appellee's operations are "closely related, functionally and economically" to the "transportation of property by railroad." Accordingly, the Board decided that appellee is an "employer" within the meaning of the first section of the Act.

3. The Board in its opinion and in its briefs and oral arguments in this court, has not contended that its interpretation of the Act, without regard to its reasonableness, binds the courts. Far more modestly, the Board contends thus: Its interpretation has no finality; a person adversely affected by the Board's decision must, of course, be afforded an opportunity to have some court decide whether an erroneous rule of law has been applied; if only one reasonable interpretation is open, that court must adopt it, regardless of the Board's view. But, if more than one reasonable interpretation is possible, the court must accord considerable weight to the Board's interpretation, made as a necessary adjunct of the Board's administrative decision rendered after an administrative hearing; the court must then accept the Board's interpretation if it is reasonably permissible. I agree with this contention. Approaching the statute in this manner, I think that, for reasons I shall state later, the Board's interpretation should be sustained because it is not unreasonable, even if an alternative interpretation might also be reasonable.

4. My colleagues do not deal with the Board's modest contention: They do not consider whether the Board's construction of the Act is reasonably permissible and therefore to be followed by us. Instead, they hold that no more weight can be judicially accorded the Board's interpretation than if it were (a) part of an argument advanced by an ordinary private litigant in a suit involving the meaning of the statute, or (b) the interpretation of the statute by a lower court or (c) of a court in another jurisdiction in another unrelated suit involving this statute. My colleagues therefore proceed to their own independent construction of the Act, without attaching any peculiar significance to the Board's, and, on that basis, conclude that the Board erred.

I think that, in the light of the Supreme Court decisions, my colleagues are wrong in their approach. Because of those Supreme Court decisions, I think that, even if the Board's construction of the Act had not been embodied in a decision reached after an administrative hearing, the courts would be obliged to give more respect to that construction than to that of an ordinary litigant, a lower court, or a court in another jurisdiction. I shall discuss this subject in some detail not merely because of its bearing on the instant case but for fear that, unless I do, the views here expressed by Judge Hutcheson may be taken as indicating the position of this Circuit in dealing with administrative agencies generally.

In arriving at his conclusion, Judge Hutcheson, speaking in the instant case for this court, repeats and relies upon the reasoning which, speaking for the Fifth Circuit, he employed in a dictum some four years ago in Fleming v. A. H. Belo Corporation, 5 Cir., 121 F.2d 207, 213, a case involving a statutory interpretation by the Wage and Hour Administrator.[6] But, significantly, Judge Hutcheson, in his opinion in the instant case, refrains from

[6] The Supreme Court affirmed the decision in the Belo case, but it did not adopt Judge Hutcheson's dictum; it rested its decision, in effect, on the ground that the Administrator's interpretation was clearly at variance with the legislative intention. Walling v. Belo Corporation, 316 U.S. 624, 62 S.Ct. 1223, 86 L. Ed. 1716. On the very day of its Belo decision, the Supreme Court, in Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 580, 62 S.Ct. 1216, 86 L.Ed. 1682 note 17, said that the Wage and Hour Administrator's "interpretative bulletins * * * carry persuasiveness as an expression of the view of those experienced in the administration of the Act and acting with the advice of a staff specializing in its interpretation and application." That ruling is surely at variance with Judge Hutcheson's dictum.

That dictum criticized the following statement of the Supreme Court in United States v. American Trucking Associations, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345, with reference to recent administrative interpretations of a new and untried statute: "In any case such interpretations are entitled to great weight. This is peculiarly true here where the interpretations involve 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" Despite Judge Hutcheson's adverse comment, the Supreme Court has

mentioning Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, in which, a few weeks ago, the Supreme Court, unanimously reversing the Fifth Circuit,[7] flatly rejected that reasoning. There, in an action brought by the Wage and Hour Administrator to enforce the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., the Supreme Court said (per Mr. Justice Jackson): "Congress did not utilize the services of an administrative agency to find facts and to determine in the first instance whether particular cases fall within or without the Act. Instead, it put this responsibility on the courts. Kirschbaum v. Walling, 316 U.S. 517, 523, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638. But it did create the office of Administrator, impose upon him a variety of duties, endow him with powers to inform himself of conditions in. industries and employments subject to the Act, and put on him the duties of bringing injunction actions to restrain violations. Pursuit of his duties has accumulated a considerable experience in the problems of ascertaining working time in employments involving periods of inactivity and a knowledge of the customs prevailing in reference to their solution. From these he is obliged to reach conclusions as to conduct without the law, so that he should seek injunctions to stop it, and that within the law, so that he has no call to interfere. He has set forth his views of the application of the Act under different circumstances in an interpretative bulletin and in informal rulings. They provide a practical guide to employers and employees as to how the office representing the public interest in its enforcement will seek to apply it. Wage and Hour Division Interpretative Bulletin No. 13 * * *. There is no statutory provision as to what, if any, deference courts should pay to the Administrator's conclusions. And, while we have given them notice, we have had no occasion to try to prescribe their influence. The rulings of this Administrator are not reached as a result of hearing adversary proceedings in which he finds facts from evidence and reaches conclusions of law from findings of fact. They are not, of course, conclusive, even in the cases with which they directly deal, much less in those to which they apply only by analogy. They do not constitute an interpretation of the Act or a standard for judging factual situations which binds a district court's processes, as an authoritative pronouncement of a higher court might do. But the Administrator's policies are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case. They do determine the policy which will guide applications for enforcement by injunction on behalf of the Government. Good administration of the Act and good judicial administration alike require that the standards of public enforcement and those for determining private rights shall be at variance only where justified by very good reasons. The fact that the Administrator's policies and standards are not reached by trial in adversary form does not mean that they are not entitled to respect. This Court has long given considerable and in some cases decisive weight to Treasury Decisions and to interpretative regulations of the Treasury and of other bodies that were not of adversary origin. We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control" 323 U. S. at pages 139, 140, 65 S.Ct. 163, 164. I find it impossible to reconcile that opinion with what Judge Hutcheson said in the Belo case or says in his opinion here.

It surprises me that the mild doctrine of the Skidmore case should be regarded as heresy.[8] It scarcely deserves Judge Hutcheson's eloquent denunciation, adorned

---

subsequently in several cases cited this criticized passage. See, e. g., Overnight Motor Co. v. Missel, 316 U.S. 572, 581, 62 S.Ct. 1216, 86 L.Ed. 1682; Noble v. United States, 319 U.S. 88, 93, 63 S.Ct. 950, 87 L.Ed. 1277; Colgate Co. v. United States, 320 U.S. 422, 426; National Labor Relations Board v. Hearst Publi-

cations, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170.

[7] 136 F.2d 112.

[8] In the Belo case, Judge Hutcheson overstated the Administrator's contention before denouncing it. And, in the instant case, he has similarly overstated the Board's contention before lampooning it.

with quotations from the writings of George Buchanan (1506-1582),[9] Richard Hooker (1554-1600)[10] and John Locke (1632-1704).[11] Judge Hutcheson might more pertinently have quoted from a more recent English writer, J. Toulmin Smith, who in 1849, in his book Government by Commission, warned his countrymen that "the blighting influence of Commissions" granted powers in violation of "fundamental law," "has so overspread the land * * * that total subversion of all free institutions and of all free spirit of enterprise has been reached."[12] But as Cav-

---

[9] Buchanan's book, De jure regni apud Scotos, was written in 1579 for the instruction of the future King James I of England. Previously, Buchanan had assisted at the trial of James' mother Mary Queen of Scots; we are told that "it must be admitted that Buchanan was a willing agent in Moray's disingenuous handling of the case against the Queen." 4 Encyc. Britannica (1943) 310.

[10] "The main object of" Hooker's book, The Laws of Ecclesiastical Polity, written in the latter part of the 16th century, "was to show that the Puritans, in refusing obedience to the established church, were implicitly denying the foundations of all political obligations." It "was the last great statement of what might be called the medieval tradition, before that tradition was snapped by the stresses and strains of civil war." It was a "defense of the royal leadership of the national church. * * *" Sabine, A History of Political Theory (1937) 439, 443.

[11] Locke, writing at the end of the 17th century, defending the revolution of 1689, urged, as essential, a separation of governmental functions into the legislative, the executive and the "federative" function (the latter being the treaty-making or "foreign office" function).

However, he went further than in this country we would go, in suggesting that discretion must be vested in the executive, saying that "many things there are which the law can by no means provide for, and these must necessarily be left to the discretion of him that has the executive power in his hands, to be ordered by him as the public good and advantage should require. * * * This power to act according to discretion for the public good, without the prescription of the law and sometimes even against it, is that which is called the prerogative. * * *" Because, among other things, "it is impossible to foresee and so by laws to provide for all accidents and necessities that may concern the public, or make such laws as will do no harm, if they are exercised with an inflexible rigor on all occasions and upon all persons that may come in their way, therefore there is a latitude left to the executive power to do many things which the laws do not prescribe." Locke's second Treatise Concerning Civil Government (1690) Chapters XII and XIII.

In the 18th century English government, which corresponded roughly to Locke's formula, there was by no means a rigid separation of powers. Holdsworth, History of English Law, X, 720 (1938). Holdsworth says that Lévy-Ullman is quite correct in noting that England "is not the classic country of the separation of powers" and that "each unit of government has of its own characteristic expression without ceasing to retain some of the features of the others"; he also endorses Halévy's comment that in the 18th century "the British government was not a government in which all the powers were clearly distinguished. It was rather a government in which all the constituent parts were confused and in which all the powers mutually encroached." And Holdsworth goes on to say: "We have seen that, in the sphere of local government, the distinction between the three different functions of government did not exist; that quarter and petty sessions, in town and country alike, exercised legislative, executive and judicial functions; and that the functions of many of the other units of local government were equally amorphous. It was the same with the central government. The Crown was and still is an essential part of the Legislature; and, in the eighteenth century, the Crown was able, wherever it wished to do so, both to initiate legislation, and to exercise a considerable influence on the content of bills pending in the two Houses of Parliament. The House of Lords," which acted as a court, "was and still is a part of the legislative machinery of the state. Some of the privileges of the House of Commons gave and still give it some of the characteristics of a court of law. * * * The Lord Chancellor was, and still is, a judge, a member of the House of Lords, and a minister; in at least one instance, the Lord Chief Justice of the King's Bench had been a member of the cabinet."

[12] Smith inveighed against those who, ignoring "fundamental law," were "striving to obtain all arbitrary power over every species of property, public and private, under the cloak of 'Commissions'. * * * By the fundamental law * * *

484

ers observes,[13] England, which did not heed Smith's warnings, and which indeed subsequently extended the powers of Commissions, "managed to survive for many decades"; in fact, in the forty years following Smith's disregarded Jeremaid, England rose to the height of her prosperity while winning the admiration of all lovers of democracy for the liberty-cherishing character of her domestic institutions.

The Skidmore doctrine is not new.[14] The Supreme Court had previously said much the same, although somewhat more elliptically, as to the Wage and Hour Administrator,[15] and at length—but with more emphasis—as to other administrative officers and agencies when engaged in interpreting statutes in connection with decisions made after administrative hearings.[16]

Even before the Supreme Court had thus plainly spoken, this court, more than six years ago, in Securities and Exchange Commission v. Associated Gas & Electric Co., 2 Cir., 99 F.2d 795, 798, when sustaining an administrative statutory interpretation, had

said (per Judge A. N. Hand): "Moreover, we are dealing with a new act the administration of which is the peculiar function of the Securities and Exchange Commission. One of the principal reasons for the creation of such a bureau is to secure the benefit of special knowledge acquired through continuous experience in a difficult and complicated field. Its interpretation of the act should control unless plainly erroneous. In no other way can the objects of the act be attained without constant and disconcerting friction. *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796."

Judge Hutcheson, in support of his position, cites and quotes a truncated portion of our opinion in *Niagara Falls Power Co. v. Federal Power Commission,* 2 Cir., 137 F.2d 787, 792; but in that case, where an initial statutory interpretation by a Commission had later been rejected by it, we accepted the subsequent administrative interpretation, saying (137 F.2d 787 at page 792): "Indeed, the very reason which for-

every possible precaution is taken against the person or property of any man becoming the victim, under any pretext whatever, of any arbitrary caprice or prejudice. * * * The blighting influence of Commissions has so overspread the land * * * that the total subversion of all free institutions and of all spirit of enterprise and energy has been reached. * * * All such Commissions * * * have * * * the same and necessary tendency and result of introducing an arbitrary power and government. * * * They are the purely arbitrary instruments of irresponsible and despotic power." To Commissions "are daily being more and more given over, the arbitrary management and control of the properties and liberties of Englishmen. * * * There now exist in this country many courts [Commissions] * * * as illegal and arbitrary as the Court of Star Chamber. * * * Parliament itself will soon be reduced to be little more than the register of the decrees of an absolute government. * * * Many of its most essential functions are now openly attempted to be discharged * * * not by the common council of the whole nation, elected by the nation, but by a few belonging to a special clique, and selected by the ministers of the crown. * * * What is wanted is the unfettering of all individual effort; the taking off of those trammels that bind down skill and enterprises and all self-depending energies, and are daily binding them down harder.

* * * If this country is to maintain its position, if it is to be secure against such scenes as the nations of Continental Europe have beheld during the past year, * * * some must be found who, taking their stand on the Fundamental Laws and Institutions of the land, shall thus achieve that first and most essential step by which this country shall be relieved from the now all-prevailing incubus of Government by Commissions."

[13] 47 Yale L.J. (1938) 675, 678.

[14] In 1877, the Supreme Court said in *United States v. Moore,* 95 U.S. 760, 763, 24 L.Ed. 588: "The construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons. *Edwards' [Lessee] v. Darby,* 12 Wheat. 206, 210 [6 L.Ed. 603]; *United States v. The State Bank of North Carolina,* 6 Pet. 29 [8 L.Ed. 308]; *United States v. MacDaniel,* 7 Pet. 1 [8 L.Ed. 587]. The officers concerned are usually able men, and masters of the subject."

[15] See, e. g., *Overnight Motor Co. v. Missel,* 316 U.S. 572, 580, 62 S.Ct. 1216, 86 L.Ed. 1682 note 17; *United States v. American Trucking Associations,* 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345.

[16] See, e. g., *Gray v. Powell,* 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; *National Labor Relations Board v. Hearst Publications,* 322 U.S. 111, 130-131, 64 S.Ct. 851, 88 L.Ed. 1170.

bids a court from lightly overruling an administrative ruling, a fortiori forbids its undertaking to say that a later ruling is mistaken when it reverses the earlier one. We must assume that continued occupation with the subject has disclosed the past error better than we can do ourselves."

In this circuit, recognizing the Supreme Court as the authoritative head of the federal judicial hierarchy, we have heretofore felt obligated, as an intermediate tribunal, to follow the rulings of that Court whether or not any members of this court happened to like those rulings.[17] Consequently, I do not feel it necessary to defend the Supreme Court against charges of heresy; for I think we must bow to its determinations even if, perchance, we should find Judge Hutcheson's political philosophy and heresiography more attractive.[18]

I note in passing that in this Circuit we have not believed that the Supreme Court has suggested that we submit to "administrative absolutism,"[19] and consequently we have not hesitated to protect the legal rights of citizens when administrative officers have acted in excess of their statutory powers. See, e.g., Goldman v. American Dealers Service, 2 Cir., 135 F.2d 398; United States ex rel. Beye v. Downer, 2 Cir., 143 F.2d 125; The Truth Seeker Co., Inc. v. Durning, 2 Cir., 147 F.2d 54; In the Matter of New York, New Haven & Hartford Railroad Company, 2 Cir., 147 F.2d 40; Bowles v. Sacher, 2 Cir., 146 F.2d 186.

The Skidmore case should constrain us to respect the Board's statutory interpretation, even if the Board had merely the statutory authority of the Wage and Hour Administrator. But the Board's authority is greater. As noted in the Skidmore case, the Wage and Hour Administrator is not empowered, ordinarily, to hold an administrative hearing before he brings a suit to enforce the Fair Labor Standards Act.[20]

---

[17] We have often accepted Supreme Court doctrines of which we were critical. See, e. g., Wallace v. United States, 2 Cir., 142 F.2d 240, 243; Hammond-Knowlton v. United States, 2 Cir., 121 F. 2d 192.

We have also said that it is our duty to follow "doctrinal trends" clearly manifest in Supreme Court decisions. See L. Hand, J., in Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632, 636; Zalkind v. Scheinman, 2 Cir., 139 F.2d 895, 903; Cf. Choate v. Commissioner of Internal Revenue, 2 Cir., 129 F.2d 684, 686.

[18] I cannot believe it advisable to reintroduce into our legal system the notion of heresy, i. e., the wilful and persistent opposition to ideas authoritatively defined as truth. Surely we do not want to revert to treating erroneous thinking as a crime, to retrace the steps which led away from the pernicious writ de haeritico comburendi. We should remember that those zealous to condemn men to burning at the stake for heresy acknowledged that heresy "belonged to a man's thoughts and not his deeds," and could therefore be proved only by suspicion; that, consequently, they instituted a regime of systematic inquiry into what went on in men's minds, and graded suspicions into "light" suspicions calling for vigilance, "vehement" suspicions demanding punishment, and "violent" suspicions, requiring punishment by the State.

John Stuart Mill wisely observed: "But it is not the minds of heretics that are deteriorated most by the ban placed on all inquiry which does not end in ortho-dox conclusions. The greatest harm is to whose who are not heretics, and whose mental development is cramped, and their reason cowed, by the fear of heresy. There have been great * * * individual thinkers in a general atmosphere of mental slavery. But there never has been, nor ever will be, in that atmosphere an intellectually active people. * * * He who knows only his own side of the case knows little of that." Liberty, Chapter II.

[19] The use of the phrase "administrative absolutism" (a product of epithetical jurisprudence) has become fashionable with those who maintain that invariably—in the very nature of things—administrative agencies, and especially the federal agencies, tend to deprive citizens of their civil liberties, while, by way of contrast, the courts, because of their inherent nature, zealously protect those fundamental legal rights. Judge Wyzanski recently raised a grave doubt as to the universal validity of that thesis. "It is not an accident," he writes, "that the administrative machinery of the Fair Employment Practices Commission has accomplished more in three years than the courts in seventy-five years under national and local laws against discrimination." 58 Harv.L.Rev. (1945) 285, 288. Of course, Judge Wyzanski would not for a moment deny the right to, or question the wisdom of, judicial review of an administrative agency's conduct; nor would I.

[20] Certain exceptions (with reference to industry orders) are not pertinent here. Gemsco v. Walling, 65 S.Ct. 605.

486

But, unlike that Administrator, the Retirement Board is authorized and directed by Congress to make administrative decisions in specific cases. True, the Retirement Act does not specifically require that, before reaching its decisions, the Board shall hold hearings (at which it receives evidence) and file findings of fact and legal conclusions. But the Act [20a] does require the Board to "establish rules and regulations to provide for the adjustment of all controversial matters arising in the administration" of the Act, coupling this requirement with one empowering the Board to "require and compel the attendance of witnesses, administer oaths" and "take testimony." Pursuant to these provisions, the Board has established detailed regulations for formal hearings, with an opportunity to be heard, and for decisions coupled with findings (based on the evidence) and conclusions of law. And, as to appellee, just that has been done. In the discharge of its statutory duty in arriving at its decision here, the Board has, unavoidably, interpreted the statute. Such an interpretation, consequently, ranks higher than that of the Wage and Hour Administrator in cases where he holds no hearings.[21]

The Retirement Board's interpretation is, I think, in the same category as the interpretation by the National Labor Relations Board of the meaning of the word "employees" in the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. In National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 130, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170, the Court held that where that Board, in the course of a specific proceeding necessarily involving that issue, holds that certain persons are "employees," then "the reviewing court's function is limited," [22] more limited than when similar "questions of statutory interpretation" arise "in the first instance in judicial proceedings" (although even

then, the Supreme Court said the courts must give "appropriate weight" to the interpretation "of those whose special duty is to administer the questioned statute"). The Supreme Court said that it was "not necessary" for the courts "to make a completely definitive limitation around the term 'employee.' That task has been assigned primarily to the agency created by Congress to administer the Act. * * * Resolving that question * * * 'belongs to the usual [administration]' of the Board. Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 332, 86 L.Ed. 301. Cf. National Labor Relations Board v. Standard Oil Co., 2 Cir., 138 F.2d 885, 887, 888." [23] It is not without significance that the Supreme Court in so deciding reversed the Ninth Circuit [24] which, in its opinion, used substantially the same reasoning for disregarding the administrative interpretation as that contained in Judge Hutcheson's opinion here.

Whether particular persons are "employees" under the National Labor Relations Act is no more and no less "jurisdictional" than whether a particular person is an "employer" within the definition of that term under the Retirement Act; and the N.L.R.A. gives the Labor Board no more and no less express authority to construe "employees" than the Retirement Act gives the Retirement Board to construe "employer," as defined in that Act. Hence I think we should no longer regard as authoritative the dictum in Shields v. Utah R. Co., 305 U.S. 177, 185, 59 S.Ct. 160, 83 L.Ed. 111, that an administrative interpretation when it involves a "jurisdictional" question can have no weight unless the administrative agency is specifically directed by the statute to pass on such a question.[24a] Accordingly, I think we should not follow the dictum in Utah Copper Co. v. Railroad Retirement Board, 10 Cir., 129 F.2d 358, 361 which rested on the dictum in the Shields case.[25] It is noteworthy, in this

---

[20a] 45 U.S.C.A. § 228j(b) 4.

[21] As to the effect of an administrative hearing on an administrative interpretation, see Southern Garment Manufacturers v. Fleming, 74 App.D.C. 228, 122 F.2d 622, 633.

[22] Citing United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

[23] The Standard Oil opinion was by this court (per L. Hand, J.); it described, in the cited portion, the limited power of courts in reviewing administrative decisions.

[24] 136 F.2d 608, 611, 612.

[24a] Cf. Dickinson, Crowell v. Benson: Judicial Review of Administrative Determination of Questions of "Constitutional Fact," 80 U. of Pa.L.Rev. (1932) 1055, 4 Selected Essays on Constitutional Law, 993, 998-1000, 1002-1004, 1013, 1014, 1017-1020; Jacoby, Administrative Law and Railroad Retirement Legislation, 12 U. of Chi.L.Rev. (1944) 26, 48-56.

[25] Ellers v. Railroad Retirement Board, 2 Cir., 132 F.2d 636, 638, 639 is not in point. There we held that no weight

connection, that in reaching its conclusion in the Hearst case, the Supreme Court cited Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301, and United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; for the Supreme Court thus further showed that the worth of an administrative interpretation is the same whether (as in Gray v. Powell and United States v. American Trucking Associations) the administrative officer is specifically required to determine a "jurisdictional" issue, or (as in the Hearst case) merely required to do so impliedly as an unavoidable incident of the discharge of its statutory duty in hearing and deciding a particular case.

I do not believe (as my colleagues do) that, when the Supreme Court in the Hearst case spoke of a "broad statutory term," it intended to preclude the application of the doctrine it there announced to statutory terms which, while somewhat detailed, are reasonably capable of alternative interpretations. Nor can I agree with the suggestion that we should assume that Supreme Court rulings relative to the Labor Board are not to be applied to other agencies when the Supreme Court's opinions otherwise indicate; we rejected such an argument in Herzfield v. Federal Trade Commission, 2 Cir., 140 F.2d 207, 209. And Gray v. Powell, 314 U.S. 402 at page 412, 62 S.Ct. 326, 86 L.Ed. 301, answers the suggestion that the doctrine here under discussion becomes inoperative when there is "no dispute as to the evidentiary facts."

For the foregoing reasons, and in line with previous uniform decisions in this Circuit, I agree with the Retirement Board's contention that we must accord considerable weight to its statutory construction, necessarily incident to its decision rendered in this particular case after an administrative hearing.[26] To quote the Attorney General's Committee on Administrative Procedure, the question is not whether the Board gave the statute the "right interpretation," but whether its interpretation has "substantial support."[27] We have heretofore in this court and I think we should now read the Supreme Court's decisions[28] as admonishing us thus: The courts must acquiesce in such an administrative interpretation unless it is plainly erroneous;[29] if the Board's conclusion is rationally permissible, it is irrelevant that, independently, we might otherwise reasonably construe the statute; when two or more alternative interpretations are open, the administrative interpretation if reasonable must be accepted. This doctrine of the Supreme Court has been stated succinctly by the Attorney General's Committee as follows: An administrative body's interpretation "is to be given weight—not merely as the opinion of some men or even of a lower tribunal, but as the opinion of the body especially familiar with the problems dealt with by the statute and burdened with the duty of enforcing it."[30] Cf. Gray v. Powell, 314 U.S. 402, 413, 62 S.Ct. 326, 86 L.Ed. 301; Dickinson, Judicial Review of Administrative Determinations, 25 Minn. L.Rev. (1941) 588, 592–593; Stern, Review of Findings of Administrators, Judges and Juries, 58 Harv.L.Rev. (1944) 70, 99–109. 122–124; Timberg, Administrative Fact Findings, 27 Wash.U.L.Q. (1941) 62, 169,

should be given to a regulation of the Board determining a fact affecting not the Board's jurisdiction but that of the district courts.

[26] See, e. g., Securities and Exchange Commission v. Associated Gas & Electric Co., 2 Cir., 99 F.2d 795, 798; Morgan Stanley & Co. v. Securities and Exchange Commission, 2 Cir., 126 F.2d 325, 332; Associated Industries v. Ickes, 2 Cir., 134 F.2d 694, 710-711; Niagara Falls Power Co. v. Federal Power Commission, 2 Cir., 137 F.2d 787, 792.

[27] Final Report of Attorney General's Committee on Administrative Procedure (1941) 90, 91.

[28] See, e. g., United States v. American Truckings Associations, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326,

86 L.Ed. 301; National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 130-131, 64 S.Ct. 851, 88 L.Ed. 1170; Overnight Motor Co. v. Missel, 316 U.S. 572, 580, 62 S.Ct. 1216, 86 L.Ed. 1682; Billings v. Truesdell, 321 U.S. 542, 552. 64 S.Ct. 737, 88 L.Ed. 917; Colgate v. United States, 320 U.S. 422, 426, 64 S.Ct. 227, 88 L.Ed. 143; Noble v. United States, 319 U.S. 88, 93, 63 S.Ct. 950, 87 L.Ed. 1277.

[29] I so read the statement in National Labor Relations Board v. Hearst Publications, supra, at page 131 of 322 U.S. that the administrative interpretation must be accepted if "it has a 'warrant in the record' and a reasonable basis in law."

[30] Loc. cit., supra, note 27, p. 91.

488

4 Pike & Fischer, Administrative Law, 359 at 383.

5. Accordingly, I consider it our restricted function to ascertain whether the language of the Act precludes the Board's conclusion on the ground that it lacks reasonableness. Applying that test, I think we should sustain the Board's decision.

Appellee rests its contention as to the unreasonableness of the Board's conclusion on the following grounds: (1) The language of the "employer" definition in the Retirement Act is virtually the same as that found in the definition of "transportation" in the first section of the Transportation Act.[31] (2) The courts and the Interstate Commerce Commission have so construed "transportation" in the Transportation Act as to include only acts done in discharge of a carrier's obligations imposed upon it by law or contract. (3) Therefore appellee is not an "employer," because it does not perform acts for the Pennsylvania in the discharge of that carrier's obligations thus imposed upon it. I do not agree that such an argument compels the conclusion that the Board unreasonably interpreted the statute.

(a) In the first place, as the purposes of the two statutes are not identical, this argument would not necessarily be sound even if the two sections were identically worded. United States v. Colorado & N. W. R. Co., 8 Cir., 157 F. 321, 330, 15 L.R.A.,N.S., 167, 13 Ann.Cas. 893 (certiorari denied 209 U.S. 544, 28 S.Ct. 570, 52 L.Ed. 919) construing the Safety Appliance Act, 45 U.S. C.A. § 1 et seq.; cf. South Chicago Co. v. Bassett, 309 U.S. 251, 259-261, 60 S.Ct. 544, 84 L.Ed. 732.

(b) More important, the two sections are not identical. The Transportation Act, in defining "transportation," includes railroad facilities "and all services in connection with the receipt, delivery * * * storage, and handling of property transported." The same language is found in the definition of "employer" in the Retirement Act. But the definition of "transportation" in the Transportation Act does not include the phrase, contained in the Retirement Act, "performs any service * * * in connection with the transportation of * * * property by railroad." And the phrase as to "storage," etc., common to both Acts, is, in the Retirement Act, separated from the other phrase (i.e., "any service in connection with the transportation") by the word "or." The Retirement Act definition is thus disjunctive. It is therefore broader than the definition in the Transportation Act. To hold otherwise would be to read out of the Retirement Act the phrase "any service * * * in connection with the transportation * * *."[31a]

It follows, I think, that the Board reasonably concluded that the Retirement Act coverage is not limited to the same subject matter as "transportation" in the Transportation Act. Accordingly, we cannot say that the Board's interpretation of the Retirement Act to include appellee as an "employer" was unreasonable. If that be true, we never reach the question whether the construction for which appellee contends, and which my colleagues accept, is not also an alternative reasonable reading of the statute.

6. My colleagues state that "in litigation over the meaning of the definition [of employer] when used in the Carrier's Taxing Act, the courts have uniformly repudiated the construction now placed by the Board in favor of the one we take," citing, as evidence of this uniformity, Allen v. Ocean S. S. Co. of Savannah, 5 Cir., 123 F.2d 469 and Magruder (Walling) v. Baltimore Steam Packet Co., 4 Cir., 144 F.2d 130. Those cases, however, did not relate to warehouse companies like appellee but to steamboat companies; and it may well be that the legislative history excludes entities of the latter kind from the Act's coverage, a question we need not here consider.

7. The legislative history does not, however, shed too much light on the application of the Act to a warehouse company operating as does appellee.

Appellee stresses the testimony of witnesses before Congressional committees as showing that the purpose of Congress was not to include such a company within the Act. But it has never been held that such testimony constitutes part of the legislative history bearing on the legislative intention. Associated Industries v. Ickes, 2 Cir., 134 F.2d 694, 710.[32] What we said in Securities and Exchange Commission v.

---

31 49 U.S.C.A. § 1(3).

31a That such an interpretation is improper, see, e. g., McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed.

164; Ex Parte Public Bank, 278 U.S. 101, 104, 49 S.Ct. 43, 73 L.Ed. 202.

32 Cf. McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 493-494, 51 S.Ct. 510, 75 L.Ed. 1183.

Robert Collier, 2 Cir., 76 F.2d 939, 941 is not apposite; there the testimony consisted of recommendations, for amendment of a statute, made by the administrative agency responsible for prosecution of the new functions conferred upon it by the amendment. In the case of an ordinary witness, the fact that he aided in drafting the bill is of little significance, for the reasons expressed by Lord Halsbury in Holden v. Dexter [1902] A.C. 474, 477.

The Board, however, directs attention to this passage in the report of the Senate Committee: "By these changes there are brought within the scope of the Act substantially all those organizations which are intimately related to the transportation of passengers or property in the United States." The Board also cites the statement on the floor of the Senate by Senator Wagner, who was then in charge of the Bill, that "it covers a great number of employees, not only those directly in the railroad business but those associated with it, and in that regard is more liberal than the present Act." While these remarks are legitimate parts of the legislative history and favor the Board's position, nevertheless they are somewhat ambiguous since they may have referred to portions of the initial section of the Act not here pertinent.

8. My colleagues seek to diminish the importance of the Board's statutory interpretation on three grounds:

(a) The Board's decision, say my colleagues, was by "a bare majority." But since there are but three members of the Board, any of its decisions if not unanimous must be by a majority of one. So, too, is the decision of this court in this case; and we have held that a dissent by a member of an administrative agency no more vitiates its decision than does a dissent in the case of a judicial decision.[33]

(b) The Board's proceeding began, say my colleagues, with a mere opinion of its General Counsel, which the Board substantially adopted as its decision. But this procedure is expressly contemplated by the Act [34] which empowers the Board "to delegate to any of its employees the power to make decisions on applications for annuities or death benefits in accordance with rules and regulations prescribed by the Board, Provided, however, That any person aggrieved by a decision so made shall have the right to appeal to the Board." The Board's regulations, pursuant to this statutory provision, delegate initial decision-making to its General Counsel and provide for an appeal to the Board. Here appellee thus appealed, and, on that appeal, the Board gave its decision after a full hearing.

(c) The members of the Board, my colleagues say, are "appointed on a partisan basis." Nevertheless both Judge Hutcheson, in South v. Retirement Board, 5 Cir., 131 F.2d 748, 750,[34a] and this court in Ellers v. Retirement Board, 2 Cir., 132 F.2d 636, 639-640, have heretofore dealt with this Board as if its "informed" or "experienced" judgment entitled its decisions to precisely the same judicial respect as that of any other administrative agency.[34b]

9. To the argument that the Board's interpretation means the inclusion of many activities outside the "railroad industry" the short answer is that it does not do so unless the company performing the services is owned or controlled by a carrier. If a company both (a) performs such services and (b) is thus owned, it is not necessary that the company be, in effect, a mere incorporated department of the railroad company. I see no cogency in the argument that the Board's decision brings within the Act a warehouse company performing services of the type defined in the Act,

---

[33] Sperry Gyroscope Co. v. National Labor Relations Board, 2 Cir., 129 F.2d 922, 924.

[34] 45 U.S.C.A. § 228j(b) 5.

[34a] Judge Hutcheson's opinion in South v. Retirement Board, supra, expressly adopted "as correct" the statement of Judge Underwood in Holloway v. Railroad Retirement Board, D.C., 44 F.Supp. 59; there Judge Underwood spoke of the "informed judgment" and the "experienced judgment" of this Board, citing cases relating, inter alia, to the Interstate Commerce Commission, the National Labor Relations Board, and the Federal Communications Commission.

[34b] True, South v. Retirement Board, supra, dealt solely with the Board's fact-finding power. But Judge Hutcheson regards that as the only power of any administrative agency which the courts must respect. If, however, he is wrong on that issue, and if statutory interpretations of such agencies do deserve judicial respect because based on "experienced judgment," then I fail to see how he can rationally differentiate such interpretations by this Board merely because of the manner in which, by statute, its members are appointed, since he has held that this Board's judgment is no less "experienced" than that of other agencies.

if the company is owned or controlled by a railroad company, but not if it is independently owned and controlled. Congress, not the Board, made that differentiation. Nor will it do to "parade the horribles" by pointing to the possibility that the Board may hereafter seek to apply the Act to companies whose services have no intimate relation to a carrier's transportation activities.[35] If such cases should arise, the court will deal with them.

It should be noted in this connection that, as pointed out in its opinion in this case, the Board has decided that many types of non-carrier companies owned or controlled by railroads are not "employers," e.g., telegraph, water-supply, bus, railroad land, electric power, companies, and many others.

10. The Board has as yet made no award in favor of anyone. It has merely said that, in connection with some pending applications for awards, by persons and in amounts not disclosed in the record, if hereafter those persons are held to be appellee's employees and otherwise entitled to relief, the Board will hold that appellee is an "employer" and therefore owes them obligations under the Act.

Nevertheless, as I view the Board's powers, appellee is a "person aggrieved" within the judicial review section of the Act (45 U.S.C.A. § 228k). For, as I believe the courts must give weight to the Board's decision interpreting the Act, I think that appellee was at once affected by the Board's decision here: Unless and until that decision is judicially set aside, appellee must, as an "employer" file reports with the Board or suffer statutory penalties;[36] if the Board's decision is incorrect, appellee, as a result of that decision while unreversed, is unjustifiably threatened with potential financial burdens. Accordingly, appellee, on my view, can maintain this suit.[37]

If, however, my colleagues' view of the Board's powers is correct, then I have difficulty in seeing a basis for this suit. For my colleagues hold that a court can give no more weight to the Board's decision than to a lawyer's opinion, and that a court can decide for itself, wholly without regard to the Board's conclusions, the status of appellee as an "employer." If that be true, then appellee after the Board's decision, as thus far made, was in precisely the same position as it had been before, so that the decision had no effect on appellee, for it was not, in legal effect, a real decision. On that assumption, (1) appellee is not a "person aggrieved," and will not be until the Board renders an award; and (2) the suit should be dismissed—as prematurely brought—without any judicial decision on the merits.[38] On my colleagues' view of the Board's power, the Board's decision being a nullity, this suit must be regarded as the equivalent of one brought for a declaratory judgment before any action taken by the Board; and I think that, in the light of the judicial review section of the Act, such a suit cannot be maintained.

---

[35] The Board's Regulation 202.7, an "interpretative" regulation, shows that the Board has no intention thus to attempt an extension of the Act.

[36] See 45 U.S.C.A. § 228m.

[37] Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563; Federal Communications Commission v. National Broadcasting Co., 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374; Associated Industries v. Ickes, 2 Cir., 134 F.2d 694.

[38] Cf. Gilbert v. Securities and Exchange Commission, 7 Cir., 146 F.2d 513; In re Michigan-Ohio Building Corporation, 7 Cir., 117 F.2d 191; Okin v. Securities and Exchange Commission, 2 Cir., 145 F.2d 206.